142 N.J. Super. 537 (1976)
362 A.2d 73
CURTIS ELEVATOR CO., INC., PLAINTIFF,
v.
HAMPSHIRE HOUSE, INC., A NEW JERSEY CORPORATION, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided February 6, 1976.
*539 Mr. Francis J. DeVito, attorney for plaintiff.
Messrs. Breslin & Breslin, attorneys for defendant (Mr. E. Carter Corriston, of counsel).
MORRISON, J.D.C., Temporarily Assigned.
Hampshire House is a 22 story, high-rise apartment building located at 1590 Anderson Avenue, Fort Lee, New Jersey. Prior to June 29, 1971 Carmelo Luppino, president and sole principal of defendant Hampshire House, Inc., and Cosimo S. Papadia, president of plaintiff Curtis Elevator Co., Inc., (Curtis) entered into negotiations involving the sale and installaton of three elevators in Hampshire house. As a result of these negotiations, which included both terms and price, a contract was entered into on June 29, 1971 executed by Luppino and Armand Domenchetti, the chief construction supervisor of Curtis. The basic terms of the contract were that Curtis would supply and install three elevators in Hampshire House for a total price of $158,000. No date was specified for completion of the elevators. Additionally the contract provided for three months maintenance by Curtis at no cost to Luppino.
The contract also contained a provision commonly known as a "strike clause," the pertinent part of which reads:
We [Curtis] shall not be liable for any loss, damage, or delay caused by strikes, lockouts, fire, explosion, theft, floods, riot, civil commotion, war, malicious mischief, act of God, or by any cause beyond our reasonable control, and in any event we shall not be liable for consequential damages * * *
It should be noted that both parties are highly skilled in their respective trades. Luppino has thirty-one years experience *540 in the construction industry and had previously built at least 5 high-rise buildings for himself and 10 to 15 buildings for others. Similarly, Curtis is a company of long standing in the business of installing and servicing elevators. Prior to the installation in Hampshire House, Curtis had worked on four other buildings of up to eight stories constructed by Luppino since 1963.
In November 1971 Curtis commenced work on the installation of all three elevators in the lower floors. The upper floors, including the housing for the hoist machinery, was not yet complete. Estimated time for completion of the project was set by Curtis at 65 weeks, barring unforeseen difficulties.
Work on the elevators proceeded uneventfully until July 1, 1972 when Local 1 of the International Elevator Construction Union went on strike, effectively halting all elevator installations within a 35-mile radius of New York City. This strike affected all companies hiring union elevator installers and lasted until February 1, 1973. At the time of the strike the elevators were working on a temporary basis, with temporary controls and platforms but no cars.
Luppino testified that prior to the strike in April or May 1972 Papadia promised to have one elevator working by August 1, 1972. Papadia denies any such agreement, nor is there any evidence that such a modification was supported by additional consideration.
Subsequently, on October 11, 1972 Luppino hired a nonunion company, Lavin Elevator, consisting of Mr. Lavin and his son, to complete the job on a time basis. Plaintiff Curtis agreed to supervise Lavin, supply materials and approved Lavin as competent. Additionally, Curtis offered to give Luppino a $3,000 per car (or $9,000) credit, which he accepted, to cover the cost of Lavin's work.
Working part-time, it took Lavin approximately six weeks to complete the first elevator, which was ready for service sometime in December 1972.
*541 The second and third were finished in February and April, respectively. Lavin ultimately billed Luppino $12,000 for the entire job.
Prior to completion of the first elevator, defendant received a limited certificate of occupancy restricting rentals to the first four floors. This necessitated that defendant retain the external construction elevator and its operator in order to be able to move the tenants' furniture into the building during the three months prior to the completion of the first elevator.
In April 1973 it was found that the generator motors had been improperly wound by General Electric for 400 volts rather than the 480 volts required. This resulted in an additional expense which the three parties, General Electric, Curtis and Luppino, agreed to share equally. During the time after completion of the contract there was no evidence that Curtis provided the free maintenance as specified under the contract. In fact, Lavin continued to maintain the elevators at a cost of $700 to defendant.
This case now comes before this court sitting without a jury for trial. Plaintiff Curtis demands the balance due on the contract, $29,500 plus $2,500 for extras requested by defendant. Plaintiff also seeks $25,405 for the extra supervision of the Lavins to complete the job. Defendant by way of counterclaim asserts claims against plaintiff of $6,758.48 for the outside hoist operator; $1,800 for three extra months rent on the outside hoist; $36,000 for loss of rents; $363.69 assessed by the State of New Jersey because Curtis was a nonregistered subcontractor, and $500 as Curtis' share of the reinstallation of the faulty generators.
The evidence elicited at trial shows that the contract, including the strike clause, executed between plaintiff and defendant is a standard contract used by all elevator installers in this area. It is agreed by both parties that subject to defendant counterclaim, there exists a balance due plaintiff on the contract of $30,500.
*542 Defendant in support of its counterclaim contends that the contract is illusory and indefinite since Curtis was not subject to a specific completion date and its promise was conditional on the nonoccurrence of specific events.
Restatement, Contracts, § 2, Comment B defines an illusory promise as follows:
An apparent promise, which according to its terms makes performance optional whatever may happen, or whatever course of conduct in other respects he may pursue, is in fact no promise, although often called an illusory promise.
It is well established in this jurisdiction that in the absence of a completion date in the contract, the law implies it shall be done in a reasonable time. Wemple v. B.F. Goodrich Co., 126 N.J.L. 465 (E. & A. 1941); Ocean Cape Hotel v. Mosefield Corp., 63 N.J. Super. 369 (App. Div. 1960). There is no evidence that the performance of this contract by Curtis was optional. Luppino himself in his deposition read into the record stated:
If there was no strike I believe we shouldn't have had any problem because he had enough time to complete the elevator.
Indeed, all parties agree that the sole cause of the delay in completion of the elevators was the strike. Therefore this court finds as a matter of fact that the strike was the sole cause of the delay in the completion of the contract and but for that delay the contract would have been performed within a reasonable time. The evidence further reveals, and this court finds as a fact, that after the strike ended, and indeed during the strike, plaintiff performed reasonably in attempting to complete the installation.
Defendant also argues that the presence of the strike clause in the standard elevator installers contract renders that contract unconscionable per se. Defendant cites the official Comment, Note 1, of N.J.S.A. 12A:2-302 which reads:
*543 The basic test is whether, in light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one sided as to be unconscionable under the circumstance existing at the time of making of the contract. * * * The principal is one of prevention of unfair surprise. [Emphasis supplied]
This court rejects defendant's contentions out of hand. Luppino testified he built for himself or others approximately 10 to 15 buildings. Both plaintiff's principal, Papadia, and defendant's principal, Luppino, are men of long experience and are highly skilled in the construction area. This contract was thoroughly negotiated at arms' length as to both terms and price. Both men had done business together several times previously without incident, involving a contract identical to the one in issue. Each knew that the elevator installers' union had a history of labor problems with strikes occurring at the termination of their contracts every three years since 1966.
There are no reported decisions in this jurisdiction concerning the legality of such a strike clause. Generally, delays occasioned by strikes do not excuse the nonperformance of contracts. 17A C.J.S., Contracts, § 505(2). However it is the law of this State that competent parties bargaining at arms' length may make their own binding stipulations with regard to the subject matter of their negotiations, unless some strong public policy operates as a bar. Terminal Const. Corp. v. Bergen, etc., Authority, 34 N.J. Super. 478, 504 (App. Div. 1954), mod. 18 N.J. 294 (1955).
Corbin, in his treatise on contracts, states:
A promise is not made insufficient as a consideration for a return promise by the fact that it is conditional, even though the condition is one that is purely fortuitous and may never happen at all. * * * A contract is not invalidated by the fact that a promisor makes his duty to render performance on the nonoccurrence of `strikes, fires, and other circumstances over which we have no control.' [Corbin on Contracts, (1 vol. ed.), § 148 at 214, 216]
For the clause to operate as a bar to liability it is necessary that the strike must be the "cause" of such a material *544 increase in cost, difficulty or impossibility of the performance of the contract. "If it makes performance `commercially impracticable' it is clearly an excuse; this might be true, under modern law, even if there were no `strike clause.'" Corbin op. cit., § 642 at 609.
A review of cases in other jurisdictions reflects this view. In Richland S.S. Co. v. Buffalo Dry Dock Co., 254 F. 668 (2 Cir.1918), cert. den. 248 U.S. 582, 39 S.Ct. 133, 63 L.Ed. 432 (1918), the Circuit Court of Appeals excused a delay by defendant in making repairs caused by a strike even in the absence of a strike clause. The rationale of the court was that a strike was one of a totality of circumstances to be considered in determining a reasonable time for performance. In Panzieri-Hogan Co. v. Bender, 205 App. Div. 398, 199 N.Y.S. 887 (App. Div. 1923), aff'd 237 N.Y. 253, 143 N.E. 739 (Ct. App. 1923), the court upheld the validity of the strike clause even though the strike was precipitated by plaintiff's reducing his workmen's wages.
In Cuyamel Fruit Co. v. Johnson Iron Works, 262 F. 387 (5 Cir.1920), cert. den. 252 U.S. 485, 40 S.Ct. 481, 64 L.Ed.2d 1025 (1920), the court held that a strike clause excused a 30-day delay in a contract that was to be performed in six days.
For additional analysis on strike clauses see Kuhlman Plastics v. Kansas City Power & Light Co., 400 S.W.2d 409 (Mo. Sup. Ct. 1966); Annotations, "Strike Clause in Contract Construction," 35 A.L.R. 721, 125 A.L.R. 1304.
It may be helpful to analogize the "strike clause" to the cases construing the "no damage" clause in this jurisdiction.
In A. Kaplen & Son v. Passaic, 42 N.J. Super. 230, 235 (App. Div. 1956), the "no damage" clause was held to be enforceable since the court could find "no reason in logic or sound policy why such a contract stipulation as was here voluntarily entered into between the parties should not be held binding * * *"
In Gherardi v. Trenton Bd. of Ed., 53 N.J. Super. 349 (App. Div. 1958), the court held:
*545 Where a party to a contract containing a `no damage' clause acts within the fair and legal import of its terms, he cannot be deprived of the benefit of his agreement unless, * * * his conduct indicates bad faith. 53 N.J. Super. at 365. See also Ace Stone v. Wayne, 47 N.J. 431 (1966).
In the present case it is agreed by both plaintiff and defendant that that strike was the immediate and only cause of the delay. Defendant read and understood the terms of the contract before entering into it. This court will not endeavor to write a better contract than these two highly skilled, intelligent parties bargaining at arms' length wrote for themselves. For the aforegoing reasons it is the opinion of this court that the strike clause in the contract is valid and enforceable. No evidence of bad faith is chargeable to either party.
Therefore plaintiff is entitled to recover on the contract price as adjusted for extras supplied at defendant's request.
Plaintiff's claim for $25,405 for supervision of the Lavins had no basis in fact. This supervisory role was incorporated in the price of the total contract.
With respect to the counterclaim, defendant's claim of $36,000 for lost rents are not proven in fact since by defendant's own proof no tenant was prepared to move in before December, at which time one elevator was working. Defendant's claim of $8,558.48 for the outside hoist operator and operator are a direct consequence of the strike and are also dismissed. With respect to defendant's claim of improper installation of the elevator rails, the testimony revealed that this was caused by excessive shrinking of the building due to an architect's error and not chargeable to plaintiff. Defendant has recovered damages for this from the architect in an out-of-court settlement. Defendant, however, is entitled to recover the $700 paid to Lavin for the maintenance which plaintiff should have provided under the contract.
Therefore the plaintiff is entitled to judgment against defendant for $30,500 (balance due on the contract as adjusted) *546 less $700 on the defendant's counterclaim paid to Lavin for the three months' free maintenance owed to defendant by plaintiff.
Judgment is entered for plaintiff and against defendant for $29,800 with costs to be taxed to the defendant.