707 A.2d 1072

LILLIAN E. BRYANT, CARL BRISCOE, TILLIE J. PETERSON, GUSTAVIA ELLIS, PIERRE HOLLINGSWORTH, MICHAEL F. JOHNSON, ELWOOD S. DAVIS, FIRST WARD CIVIC ASSOCIATION, THIRD WARD CIVIC ASSOCIATION, AND WEST SIDE PROTECTIVE HOMEOWNERS ASSOCIATION, PLAINTIFFS-APPELLANTS, v. THE CITY OF ATLANTIC CITY, AND THE MAYOR AND CITY COUNCIL OF THE CITY OF ATLANTIC CITY, DEFENDANTS-RESPONDENTS, AND MIRAGE RESORTS, INCORPORATED, DEFENDANT/INTERVENOR-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued March 25, 1998—Decided April 8, 1998.

598

600

Before Judges SHEBELL, D'ANNUNZIO and A.A. RODRGUEZ.

*Stanley C. Van Ness*, argued the cause for appellants (*Herbert, Van Ness, Cayci & Goodell*, attorneys; *Mr. Van Ness*, of counsel, and on the brief; *Karen L. Cayci*, on the brief).

*Paul A. Rowe*, argued the cause for respondents, the City of Atlantic City, and the Mayor and City Council of the City of Atlantic City (*Greenbaum, Rowe, Smith, Ravin, Davis & Himmel*, attorneys; *Mr. Rowe*, of counsel; *Alan S. Naar* and *Eric Wechselblatt*, on the brief).

*Gilbert Brooks,* argued the cause for respondent, Mirage Resorts, Incorporated (*Kozlov, Seaton, Romanini, Brooks & Greenberg,* attorneys; *Mr. Brooks,* on the brief).

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

On May 10, 1996, plaintiffs, who are residents, taxpayers and interested associations of Atlantic City, filed an action in lieu of prerogative writs in the Law Division, alleging that improper actions were taken by the City of Atlantic City's Planning Board and Mayor and Council in connection with the Huron North site. On May 20, 1996, plaintiffs filed an amended complaint. On June 10, 1996, Mirage Resorts, Incorporated (MRI) was permitted to intervene. MRI and Atlantic City filed answers to the amended complaint dated May 23 and June 24, 1996, respectively. On July 12, 1996, both Atlantic City and MRI filed motions for summary judgment. Oral arguments were conducted on October 1 and November 20, 1996. On December 23, 1996, Judge Anthony Gibson gave his oral opinion from the bench, in which he granted the summary motion judgments and dismissed plaintiffs' complaint. An order memorializing that decision was entered on January 16, 1997. Plaintiffs appeal.

Two State statutes are implicated in this appeal. The first, the New Jersey Urban Enterprise Zones Act, *N.J.S.A.* 52:27H–60 to –88, provides that any area shall be eligible for designation as an "urban enterprise zone" if the area has been qualified as an "area in need of rehabilitation," and if it meets certain other criteria established by the New Jersey Urban Enterprise Zones Authority. *N.J.S.A.* 52:27H–69. Qualified businesses within such zones shall be eligible for certain "awards," tax exemptions, and tax credits. *N.J.S.A.* 52:27H–74 to –79. The purpose of this act is to assist in the economic revitalization of urban areas suffering from economic distress. *N.J.S.A.* 52:27H–61.

The second act, the Local Redevelopment and Housing Law, *N.J.S.A.* 40A:12A–1 to –49 ("Act"), was adopted to "codify, sim-

plify and concentrate" various state laws regarding local redevelopment and housing, in an effort to assist in promoting redevelopment and new housing in areas of the State in need of rehabilitation. *N.J.S.A.* 40A:12A–2(d). Pursuant to this Act, a municipal governing body has the authority to determine whether areas within its jurisdiction are "areas in need of redevelopment." *N.J.S.A.* 40A:12A–4, –5, and –14. The governing body must, by resolution, determine which areas are in need of rehabilitation; however, that area may include the entire municipality. Prior to adopting such a resolution, the governing body must send the proposal to the planning board for its consideration. *N.J.S.A.* 40A:12A–14(a). Once an area of redevelopment has been identified, public hearings conducted by the local planning board follow, and a Redevelopment Plan can then be adopted by local ordinance. *N.J.S.A.* 40A:12A–6, –7. After a plan for rehabilitation of an area has been adopted, the municipality, or its designated redevelopment authority, can carry out the plan through the use of several enumerated powers described in *N.J.S.A.* 40A:12A–8. Any agreement reached between the municipality and the redeveloper chosen to develop the area must contain a provision prohibiting the redeveloper from selling, leasing or transferring the area in need of rehabilitation without the written consent of the municipality. *N.J.S.A.* 40A:12A–9.

The Act empowers a municipality to contract with any redeveloper for the planning, construction or undertaking of any project within an area in need of rehabilitation, and the municipality can lease or convey property to such a redeveloper, without public bidding and at prices and upon such terms as it deems reasonable. *N.J.S.A.* 40A:12A–8(f),(g). The municipality can also arrange for the relocation of residences or businesses displaced from an area in need of rehabilitation. *N.J.S.A.* 40A:12A–8(i).

The Huron North site of approximately 178 acres located in the marina section of the City, was determined to be in need of rehabilitation. It is bounded by Huron Avenue to the south,

Atlantic–Brigantine Boulevard and Massachusetts Avenue on the east, Clam Thorofare and the Penrose Canal on the north, and Absecon Boulevard to the west. One hundred and fifty acres of this parcel is owned by the City. Despite prior efforts to revitalize the area, it remained largely vacant. At the time the summary judgment motions were heard, it was used only for (1) a municipal landfill; (2) the City's public works building and maintenance yards; (3) the police department's firing range and K–9 kennel; and (4) casino employee parking. This area was zoned commercial from 1929 through 1979. In subsequent years, it consisted of three zones; resort commercial (casinos), resort service (uses in support of casinos, such as hotels and parking garages), and area commercial (commercial facilities for diverse retail uses). In 1987, the City attempted to auction forty-eight acres of the site for a minimum of $16 million, and no bids were received. It appears that development of Huron North has been hampered by a lack of direct access to it from the Atlantic City Expressway.

In May 1994, the City's Planning Director, Stuart Wiser, was asked to determine whether any or all of the City qualified as an area in need of rehabilitation pursuant to the Urban Enterprise Zones Act. Wiser concluded that the entire City qualified. On May 25, 1994, the City Council passed Resolution No. 364, which adopted a map Wiser had prepared showing the entire City as an area in need of rehabilitation. On November 2, 1994, and pursuant to *N.J.S.A.* 40A:12A–14(a), City Council passed Resolution No. 791, proposing to the Planning Board that all of the City was an "area in need of rehabilitation" pursuant to the Act. Following a hearing that same day, the Planning Board issued Resolution No. 24–94, determining that the entire City was an area in need of rehabilitation. On November 23, 1994, City Council passed Resolution No. 889, concluding that the entire City was in need of rehabilitation pursuant to the Act.

On March 1, 1995, City Council adopted Resolution No. 131, which noted that Huron North was an area in particular need of rehabilitation. It stated that the City was committed to develop-

ing family attractions to enhance "the destination resort aspects" of the City. Therefore, Council directed the Planning Board, pursuant to *N.J.S.A.* 40A:12A–7, to prepare a Redevelopment Plan for Huron North. The resolution stated that the City intended to designate itself as the redevelopment entity for the Huron North site.

On March 9, 1995, a subcommittee of the Planning Board, together with the Board's division of planning, prepared the "Huron North Redevelopment Plan" (Plan). The plan provided that the project area was intended to cover the Huron North site as previously described. The purpose of the plan was to provide a "mechanism for a public/private partnership leading to the development of 'world class' entertainment/recreation facility within the Project Area."

The plan proposed the conveyance of the City-owned land within Huron North to a redeveloper, who would create the facilities. The City's public works and police functions would be relocated. The plan created a number of "building limit controls," designed to "provide guidelines to the physical development of the Project Area." However, the redeveloper was to be encouraged to exercise maximum creativity in designing a facility consistent with the plan's objectives. The plan further noted that the City contemplated no public acquisition of private parcels within Huron North and, therefore, there would be no displacement of families or businesses and, consequently, no need for a relocation plan. The redeveloper would be required to begin and complete the proposed development within "a reasonable time period" under the plan, with more specific time schedules to be provided in any Redevelopment Agreement ultimately entered into.

On March 15, 1995, the Planning Board passed Resolution No. 8–95, reciting that it had been directed by the City Council, via Resolution No. 131, to prepare a Redevelopment Plan for Huron North. The Planning Board noted that the Board's Division of Planning and a subcommittee of that Board had prepared such a plan, and the Planning Board recommended the adoption of the

Huron North Redevelopment Plan to the City Council. On April 12, 1995, the City Council passed Ordinance No. 28, thereby adopting the Redevelopment Plan approved by the Planning Board pursuant to Resolution No. 8–95.

In September 1995, Governor Whitman formed the Task Force on Atlantic City Access and Circulation to provide additional highway capacity in Atlantic City. The "major mobility goals" of the Task Force included improving access to Brigantine and expanding access to the marina area, where the Huron North site lies. In March 1996, the Task Force issued its final report, relying on a Transportation Alternatives Report prepared by Schoor–DePalma, an engineering firm retained by MRI. Schoor had analyzed eleven alternative proposals for linking Atlantic City and the Atlantic City Expressway to the marina area and concluded that the "Penrose Canal" and "Westside Bypass" alternatives were reasonable, but that the Westside Bypass would best enhance the community.

The Westside Bypass has been described as follows:

This scenario proposes a grade separated connector, with tunnel and overpass components, between the Atlantic City Expressway and Huron Avenue. This 'inner-City connector' [also called the Westside Bypass], as presently proposed, would form an interchange with the eastbound Expressway, looping under the Expressway bridge and paralleling the waterline through the Atlantic Electric property to Horace Bryant Drive[1] where it would descend into a tunnel paralleling the length of Horace Bryant Drive, passing under Route 30 and emerging on the east side of Route 30. The roadway would then parallel the northern curbline of Route 30, crossing over Huron Avenue, looping into a connection with Brigantine Boulevard and providing access to the [Huron North site], the existing Marina casino-hotels and Brigantine. Although the design is not finalized, it is expected that a four-lane cross-section would be constructed in approximately an 85 foot right-of-way.

In August 1995, before the Task Force's final report was issued, the City passed Resolution No. 553, hiring Pennoni Associates, a traffic consultant, to perform a traffic study. On November 29,

---

[1] It is this tunnel, which would require the destruction of homes on Horace Bryant Drive, in which some appellants live, which has created the most controversy. Horace Bryant Drive is one of the few remaining stable, residential African–American neighborhoods in Atlantic City.

1995, however, before any final report was issued by Pennoni, City Council voted, via Resolution No. 866, against the Westside Bypass. Therefore, Pennoni was asked to consider alternatives to the Westside Bypass pursuant to Resolution No. 935.

Pennoni ultimately issued a report, in which it considered several alternatives, including the Westside Bypass, but ultimately recommended another option, the "Direct Connector," because it felt it, together with other city-wide improvements, would best accomplish the City's long-term goals. The Direct Connector, however, would cross substantial wetlands, thereby raising environmental concerns. The report deemed the Westside Bypass unacceptable due to its high cost, its impact on the Horace Bryant Drive neighborhood, and because it did not provide for a connection with Route 30.

On February 20, 1996, the Governor's Task Force conducted a public hearing regarding these issues. At the meeting, the advantages and disadvantages of all proposals were considered, including the Direct Connector proposed by Pennoni. On March 13, 1996, the Task Force issued its final report, concluding that the Westside Bypass was the best alternative. In July 1996, Governor Whitman adopted the recommendation and decided that the Westside Bypass should be built.

Meanwhile, in April 1995 the City issued a "request for qualifications" (RFQ) seeking responses from qualified redevelopers with the appropriate credentials to construct the facilities proposed for the Huron North site. The RFQ was widely disseminated in prominent newspapers in New York, Hong Kong, Las Vegas and Atlantic City. Two proposals were received. One was from MRI, and the other was from Marina Landing Associates (MLA), a joint venture of Harrah's Atlantic City and Trump's Castle Casino Resort.

To evaluate the proposals, the City formed the Huron North Redevelopment Committee (Redevelopment Committee) comprised of elected officials, the City's Planning Board chairperson, the chairperson of the City Council Planning and Development

Committee and other City employees. The City also engaged an accounting firm and a financial analysis firm to evaluate the proposals. Both produced reports, in which the applications were compared using criteria established by the City. The financial analysts ranked MRI equal to, or higher than, MLA with respect to each of these criteria. The Redevelopment Committee held a public meeting on September 1, 1995, to discuss the proposals. It issued a resolution recommending the selection of MRI as redeveloper, because that entity best met the criteria established by the City.

On September 6, 1995, City Council adopted Resolution No. 594, naming MRI as the redeveloper. The resolution also authorized negotiations with MRI for the purpose of entering into a memorandum of understanding (MOU) and ultimately a Redeveloper's Agreement with MRI to effectuate the proposed development.

On February 21, 1996, MRI and the City agreed on an MOU, and by Resolution No. 130, the City Council authorized the Mayor to execute the MOU. At the public hearing on Resolution No. 130, several persons expressed concerns about MRI's proposals, particularly because of the proposed Westside Bypass, which would require a tunnel under portions of Horace Bryant Drive, thereby requiring residents of that street to relocate. A council member noted that the Council had originally voted against the Westside Bypass because it believed the public was against the tunnel. However, after having learned that was not the case, many council members had changed their vote.

The MOU was executed in March and April 1996. It described a "list of current issues" which would need to be addressed and mutually resolved before a Redeveloper's Agreement could be executed. Those issues involved environmental matters, the relocation of the City's Public Works Department, job and business opportunities the proposal would create, development of the project, neighborhood concerns, and various others. After additional negotiations, all outstanding issues were resolved and the parties agreed upon a Redeveloper's Agreement. On March 28, 1996, City Council passed Ordinance No. 14, authorizing the City to

execute the Redeveloper's Agreement. The Agreement was then executed by both parties.

MRI's obligation to proceed was conditioned on approval and construction of the Westside Bypass. MRI committed to employing 2000 persons upon completion of the project. Pursuant to Section 4.3, remediation costs related to environmental problems at the Huron North site, including the prior landfill, were to be borne solely by MRI; however, if MRI determined "in its sole discretion that costs of remediation [were] unreasonable," it could elect to not proceed. If other sources of funding for such remediation became available, they would inure totally to MRI's benefit.

Further, if funds were obtained under a then-pending State Senate Bill, S–294, the first $8 million of such funds would go to the City and MRI would retain the balance. The proposed S–294, as written when the Redeveloper's Agreement was executed, would have permitted a redeveloper to receive reimbursement against future sales tax obligations for the total cost of remediating a municipal landfill such as that which existed at Huron North. However, as passed, the maximum amount of reimbursement was reduced to seventy-five percent (L. 1996, c.124, § 4).

On April 17, 1996, certain residents filed a petition seeking a referendum on Ordinance No. 14. The City filed a complaint seeking a declaratory judgment precluding the referendum. On May 15, 1996, summary judgment was granted, holding that it was impermissible to submit Ordinance No. 14 to a public referendum. We affirmed on January 2, 1997.

Meanwhile, on May 10, 1996, plaintiffs filed the complaint which is the subject of this appeal. Judge Gibson ultimately granted summary judgment to Atlantic City and MRI, and the complaint was dismissed. This appeal follows.

I

Plaintiffs contend that Atlantic City acted arbitrarily and capriciously in taking the steps that ultimately led to the Redeveloper's Agreement with MRI. We reject this contention.

Municipal action will be overturned by a court if it is arbitrary, capricious or unreasonable. *Charlie Brown of Chatham v. Board of Adjustment of Chatham*, 202 *N.J.Super.* 312, 321, 495 A.2d 119 (App.Div.1985); *Drake v. Human Servs. Dept.*, 186 *N.J.Super.* 532, 536, 453 A.2d 254 (App.Div.1982); *In re Application of Holy Name Hosp.*, 301 *N.J.Super.* 282, 295, 693 A.2d 1259 (App.Div.1997). However, municipal actions enjoy a presumption of validity. *Fanelli v. City of Trenton*, 135 *N.J.* 582, 589, 641 A.2d 541 (1994); *Ballantyne House Assocs. v. City of Newark*, 269 *N.J.Super.* 322, 337, 635 A.2d 551 (App.Div.1993). Thus, a challenge to the validity of a municipal ordinance or action must overcome the presumption of validity—a heavy burden. *515 Assocs. v. City of Newark*, 132 *N.J.* 180, 185, 623 A.2d 1366 (1993); *First Peoples Bank v. Medford Township*, 126 *N.J.* 413, 418, 599 A.2d 1248 (1991).

When two actions are open to a municipal body, municipal action is not arbitrary and capricious if exercised honestly and upon due consideration, even if an erroneous conclusion is reached. *Worthington v. Fauver*, 88 *N.J.* 183, 204–05, 440 A.2d 1128 (1982); *Bayshore Sewerage Co. v. Department of Envtl. Protection*, 122 *N.J.Super.* 184, 199, 299 A.2d 751 (Ch.Div.1973), *aff'd*, 131 *N.J.Super.* 37, 328 A.2d 246 (App.Div.1974). A determination predicated on unsupported findings is the essence of arbitrary and capricious action. *In re Boardwalk Regency Casino Licensing Application*, 180 *N.J.Super.* 324, 334, 434 A.2d 1111 (App.Div.1981), *modified on other grounds*, 90 *N.J.* 361, 447 A.2d 1335 (1982).

> Legislative bodies are presumed to act on the basis of adequate factual support and, absent a sufficient showing to the contrary, it will be assumed that their enactments rest upon some rational basis within their knowledge and experience. This presumption can be overcome only by proofs that preclude the possibility that there could have been any set of facts known to the legislative body ... [that] would rationally support a conclusion that the enactment is in the public interest.
> [*Hutton Park Gardens v. West Orange Tp. Council*, 68 *N.J.* 543, 564–65, 350 A.2d 1 (1975) (citations omitted) ].

In addition, to determine whether a municipal ordinance is authorized by a state statute, we need decide only whether that ordinance represents a reasonable exercise of the Legislature's

delegation of authority to the municipality in enacting the statute. *Fanelli v. City of Trenton, supra,* 135 *N.J.* at 591, 641 *A.*2d 541.

It is clear from the record presented to us that the motion judge utilized the proper standard of review in considering Atlantic City's actions. Plaintiffs' assertions to the contrary are without foundation. *R.* 2:11–3(e)(1)(E).

## II

Plaintiffs also assert that the judge erred in concluding that the City unconstitutionally donated public land to MRI for the construction of MRI's planned resort development. We disagree.

The New Jersey Constitution provides that, "no county, city, borough, town, township or village shall hereinafter give any money or property, or loan its money or credit to or in aid of any individual, association or corporation. . . . " *N.J. Const.* art. VIII, § 3, ¶ 2. It further provides that, "no donation of land or appropriation of money shall be made by the State or any county or municipal corporation to or for the use of any society, association or corporation whatsoever." *N.J. Const.* art. VIII, § 3, ¶ 3.

The underlying principle is that "public money should be raised and used only for public purposes." *Roe v. Kervick,* 42 *N.J.* 191, 207, 199 *A.*2d 834 (1964); *New Jersey Sports & Exposition Auth. v. McCrane,* 119 *N.J.Super.* 457, 472, 292 *A.*2d 580 (Law Div.1971), *modified on other grounds,* 61 *N.J.* 1, 292 *A.*2d 545 (1972). The "concept of public purpose is a broad one," and connotes "an activity which serves as a benefit to the community as a whole, and which, at the same time is directly related to the functions of government." *Roe v. Kervick, supra,* 42 *N.J.* at 207, 199 *A.*2d 834. We are instructed by *Roe* that our concept of public purpose must "expand when necessary to encompass changing public needs of a modern dynamic society." *Ibid.* However, the determination of what constitutes a public purpose is primarily a function of the Legislature. *New Jersey Sports & Exposition Auth. v. McCrane, supra,* 119 *N.J.Super.* at 473, 292 *A.*2d 580.

The *Roe* Court fashioned a two-part test to determine if the expenditure of public funds constitutes a prohibited donation. First, whether the provision of financial aid is for a public purpose, and second, whether the means to accomplish it are consonant with that purpose. *Roe v. Kervick, supra,* 42 *N.J.* at 212, 199 *A.*2d 834; *Patzau v. Department of Transp.,* 271 *N.J.Super.* 294, 309–10, 638 *A.*2d 866 (App.Div.), *certif. denied,* 138 *N.J.* 268, 649 *A.*2d 1288 (1994). Thus, the funded activity must be one that serves a benefit to the community as a whole and at the same time is directly related to the functions of government. *Davidson Bros., Inc. v. D. Katz and Sons, Inc.,* 121 *N.J.* 196, 217, 579 *A.*2d 288 (1990); *Roe v. Kervick, supra,* 42 *N.J.* at 207, 199 *A.*2d 834.

Judge Gibson carefully considered plaintiffs' argument that the transfer of land to MRI by the City for no consideration constituted a donation of public land (i.e., the Huron North tract) for a private purpose. He noted that the City was attempting to convert "otherwise fallow land into productive, tax-generating property" which would employ a number of citizens and improve the City's economy. In addition, he observed that the rehabilitation of deteriorating public facilities constituted a public purpose, and that but for the development in question, the site would remain unproductive. The judge then properly found that even though the Redeveloper's Agreement conferred an incidental private benefit upon MRI, that this did not render the agreement unconstitutional. Finally, the judge considered whether the action taken by the City could be expected to fulfill the stated public purpose. He concluded that the agreement contained adequate controls to maximize the likelihood that the redeveloper will develop Huron North, and that those controls adequately assured that the City's public purposes would be fulfilled.

We conclude that the judge did not err in ruling that the conveyance of Huron North to MRI did not constitute a gift and thereby violate the Constitution. While Atlantic City may have received less monetary consideration than the market value of the land, MRI did agree to expend considerable sums. These sums

may exceed the $118 million assessed value of the land. These expenditures include: (1) investigation and clean-up costs associated with the pre-existing landfill at the site, plus the first $8 million MRI would receive from the State as reimbursement for cleaning up the landfill pursuant to the Municipal Landfill Site Closure, Remediation and Redevelopment Act, *L.* 1996, *c.* 124; (2) up to $15 million for the relocation of the City facilities at the site; (3) millions related to construction of the Westside Bypass, and hundreds of thousands in inconvenience fees; and (4) establishment of a $1 million escrow fund for paying any damage claims related to construction of the bypass. Whether greater consideration could have been obtained for the tract is questionable in light of the City's prior inability to sell the land.

In any event, the conveyance still did not violate the Constitution, given the public purposes and long-term goals the City had of developing the area into a productive, world class resort. *Ott v. West New York,* 92 *N.J.Super.* 184, 202–03, 222 *A.*2d 541 (Law Div.1966). Although the consideration was not paid directly for the purchase of the land, the by-products of the expected development of the site, convinced the judge and this court that the conveyance of land to MRI did not constitute a gift.

Moreover, the conveyance of land to MRI in exchange for its promise to redevelop the site was in furtherance of the legislative public policy, as set forth in the Act, of redeveloping deteriorated public property which likely would not occur without private efforts. *N.J.S.A.* 40A:12A–2. Development of an unproductive area like Huron North constitutes a public purpose which benefits the City as a whole. *Roe v. Kervick, supra,* 42 *N.J.* at 207, 199 *A.*2d 834. Its development is directly related to several valid governmental functions, such as: (1) the relief of unemployment, *Id.* at 215, 199 *A.*2d 834; (2) the provision of recreational facilities for the public, *McCrane, supra,* 61 *N.J.* at 16, 292 *A.*2d 545; (3) increasing the City's tax base, both by redeveloping the site and by employing thousands, *Roe v. Kervick, supra,* 42 *N.J.* at 225, 199 *A.*2d 834; (4) economically rehabilitating an otherwise

unproductive area; and (5) remediating the pre-existing landfill at the site.

We also agree with the reasons expressed by Judge Gibson to support his finding that there were sufficient controls placed in the Redeveloper's Agreement to insure that the governmental functions and purposes referred to above will be met. If the property is not ultimately developed, leaving those public purposes unfilled, then the land reverts back to the City, which can then attempt to develop or sell the area again.

## III

Plaintiffs assert that Resolution No. 889, which City Council adopted in November 1994 and which designated the entire City as an area in need of rehabilitation, failed to contain sufficient findings of fact as required by *N.J.S.A.* 40A:12A–14. Defendants argue that plaintiffs' challenge to Resolution No. 889 is time barred and should not be considered by this court, as plaintiffs did not challenge the resolution until they filed their complaint in May 1996, approximately one-and-one-half years after the resolution was adopted.

Although we agree with defendants that plaintiffs' challenge to this resolution is untimely, we will consider the substance of that challenge because of the public interest involved. *R.* 4:69–6(c); *Reilly v. Brice,* 109 *N.J.* 555, 557–58, 538 *A.*2d 362 (1988).

Substantively, plaintiffs allege that Resolution No. 889 failed to contain findings of fact as required by *N.J.S.A.* 40A:12A–14. Judge Gibson rejected this argument, finding that:

> [T]he action by the City and the planning board in the determinations that it made regarding the need for rehabilitation were sound. They were certainly within the realm of discretion that this city has with respect to identifying properties in need of rehabilitation. There was certainly a sound foundation for the action that the planning board and the city took in view of the Wiser study and the variance authorities that were part of it.
>
> One of the complaints that the plaintiff makes in this area is that the resolution contains no findings of fact to support the conclusions that it contains. It's true that the resolution does not specify factual findings as such, but there is no

question in my mind, and it is fairly—it's very clear, in my judgment, from the factual background, that, indeed, the city had a factual basis for reaching those conclusions given the Wiser study and given the Wiser certification and the undisputed facts regarding it. It's clear to me that there was more than ample reason for the City of Atlantic City to conclude here that [Huron North] and other areas were in need of rehabilitation and were under-utilized. As a matter of fact, it's difficult for me to imagine a serious challenge to the notion that [Huron North] is in need of rehabilitation and that it is currently under-utilized. The fact is that it is the largest single parcel of that type. It is generating no tax revenues and it is a site of serious rodent and other infestation. The City, in fact, relied on the above statute in reaching the conclusions that it did and it was well supported through *N.J.S.A.* 40A:12A–14, which was cited at length. Therefore, I am prepared to grant summary judgment with respect to count one to the extent that it challenges the initial resolutions and ordinances of the City implementing what eventually became the Redevelopment Plan.

The judge was correct in his ruling. *N.J.S.A.* 40A:12A–14 provides in relevant part that:

A delineated area may be determined to be in need of rehabilitation if the governing body of the municipality determines by resolution that there exist in that area conditions such that (1) a significant portion of structures therein are in a deteriorated or substandard condition, (2) there is a continuing pattern of vacancy, abandonment or underutilization of properties in the area, with a persistent arrearage of property tax payments thereon, and (3) a program of rehabilitation, as defined in section 3 of P.L.1992, c. 79 (C. 40A:12A–2), may be expected to prevent further deterioration and promote the overall development of the community. Where warranted by consideration of the overall conditions and requirements of the community, a finding of need for rehabilitation may extend to the entire area of a municipality.

Thus, the statute provides that the City can designate an area, including the entire City, as an area in need of rehabilitation if it determines by resolution that the enumerated conditions exist.

Here, Resolution No. 889 did exactly that, in that it provided:

WHEREAS, a significant portion of the structures within the City of Atlantic City are in a deteriorated or substandard conditions; and

WHEREAS, there is a continuing pattern of vacancy, abandonment, or underutilization of properties in the City of Atlantic City, with a persistent arrearage of property tax payments thereon; and

WHEREAS, a program of rehabilitation, by means of extensive repair, reconstruction or renovation of existing structures, with or without the introduction of new construction or the enlargement of existing structures, will contribute to the elimination of substandard structural or housing conditions and arrest the deterioration of the City; and

WHEREAS, a consideration of the overall conditions and requirements of the community warrants a finding of a need for rehabilitation extending to the entire area of municipality;

NOW THEREFORE, BE IT RESOLVED that the City of Atlantic City in its entirety be and hereby is determined to be an area in need of rehabilitation, pursuant to *N.J.S.A.* 40[A]:12A–1 *et seq.*, as amended.

The City sufficiently complied with the requirements of *N.J.S.A.* 40A:12A–14, which, by its plain language, requires only that the City determine by resolution that the conditions exist before an area can be designated as one in need of rehabilitation.

Further, we agree with the judge's conclusion that there was more than sufficient evidence to support the City's conclusion in this respect. The City's principal planner, Wiser, analyzed the City's situation to determine if it could be deemed an area in need of rehabilitation. Wiser concluded that the entire City was such an area. Although the Wiser study did not specifically address the third criterion contained in *N.J.S.A.* 40A:12A–14, i.e., that a program of rehabilitation may be expected to prevent further deterioration and promote development of the community, the City council certainly was capable of making the judgment that the City's condition would improve if it were rehabilitated pursuant to the Act.

## IV

Plaintiffs contend that the City's actions in ultimately approving the Redeveloper's Agreement with MRI violated the provisions of *N.J.S.A.* 40A:12A–7. They first assert that City Council should have amended its Redevelopment Plan so that it conformed to the Redeveloper's Agreement ultimately executed by the City and MRI. Second, they argue that the redevelopment plan approved by the City failed to contain certain information as required by *N.J.S.A.* 40A:12A–7.

Plaintiffs urge that Ordinance No. 28 approving the Redevelopment Plan lacked significant elements contained in the project ultimately agreed upon by MRI and the City. They argue that because of this the Redevelopment Plan should have been amend-

ed to include those missing elements. Plaintiffs maintain that the consequence is that the plan failed to provide notice of many of the elements eventually included in the agreement between MRI and the City, including: (1) construction of the Westside Bypass; (2) the potential displacement of families; and (3) the fact that Huron North would be conveyed to MRI for no direct consideration.

In addressing count four of the amended complaint, which raised the argument plaintiffs assert here, Judge Gibson stated:

This count includes an allegation by the plaintiffs that the redevelopment agreement is invalid because it allegedly fails to comply with Section 7 of the redevelopment act. Well, actually that particular section deals with the plan, not the act, so that's a problem from the start, but I'm assuming what the plaintiffs mean here is that because the agreement doesn't exactly mirror what the redevelopment plan says, that the agreement itself fails to comply. I'm not persuaded by that. There is nothing in the statute that says the agreement has to exactly match the redevelopment plan. I believe that it's a fair reading of the statute, nevertheless, to conclude that the agreement must be consistent with the plan and must faithfully implement the plan, but in implementing the plan it is certainly understandable and predictable to me that the agreement would deal with a variety of things that are not necessarily mentioned in the plan, such as the contingencies that I mentioned before. Again, to the extent that this particular challenge implicates a question of notice, I'm satisfied that adequate notice of the agreement was given, that the hearings were satisfactory and that this particular plan and agreement were lawfully implemented by the City.

We agree that the Act does not require that the Redevelopment Plan mirror the ultimately approved redevelopment project. The Act provides only that "no redevelopment project shall be undertaken or carried out except in accordance with a redevelopment plan adopted by ordinance of the municipal governing body[.]" *N.J.S.A.* 40A:12A–7(a). Plaintiffs imply that the phrase "in accordance with" in *N.J.S.A.* 40A:12A–7(a) requires that the plan and project be mirror images of each other, which the Act does not require. Rather, as the judge observed, a Redeveloper's Agreement as finally executed will understandably include items not in the plan, since numerous contingencies will arise during the agreement negotiations which could not possibly have been considered when the plan was adopted.

*N.J.S.A.* 40A:12A–7(a)(1)–(5) requires only that the plan include an "outline" for the development of the project area indicating: (1)

its relationship to certain local objectives; (2) the proposed land uses and building requirements in the project area; (3) adequate provision for the relocation of residents in the project area; (4) the identity of the property within the project area which is proposed for acquisition; and (5) any significant relationship of the plan to the master plan of nearby municipalities, the county, and the State.

By contrast, *N.J.S.A.* 40A:12A–9 requires that a Redeveloper's Agreement contain several specific provisions. However, there is no indication that the provisions required by *N.J.S.A.* 40A:12A–9 to be included in the Redeveloper's Agreement must also be included in the plan. The Act does not require that a redevelopment plan be amended so that it and the Redeveloper's Agreement have similar provisions. We conclude that a redevelopment plan was not intended by our Legislature to be as comprehensive and detailed as the Redeveloper's Agreement.

Plaintiffs' assertion that they had insufficient notice of certain decisions the City made to which they were opposed, such as construction of the bypass, the displacement of families, and conveyance of the site to MRI for no direct compensation does not appear to have any basis in fact. Public hearings and meetings were conducted throughout the entire redevelopment process, interested parties were able to offer their opinions on the City's plan to redevelop the area. Further, the State Transportation Task Force held separate public meetings regarding construction of the bypass.

 Plaintiffs also claim that the Redevelopment Plan approved by City Council did not contain adequate findings as required by *N.J.S.A.* 40A:12A–7(a)(1)–(5). We reject plaintiffs' argument. Judge Gibson found that:

[T]here are certain exceptions to the generalized nature of the plan and the broad discretion that municipalities are given. In [*N.J.S.A.*] 40A:12A–7, for example, there are specific areas that the plan needs to address, five specific areas to be exact. One is that the plan must demonstrate a relationship to the objectives, the definite local objectives regarding land uses; two, the plan must contain provisions regarding proposed land uses and building requirements, if there are any; three,

the plan must contain adequate provisions for the temporary and permanent relocation of residents that are within the project area, if any; four, the plan must identify property to be acquired in the project area, if any; and five, there must be a demonstration of any significant relationship between the redevelopment plan and the master plan, not only of the municipality but any neighboring municipalities or regions, if there is any, and if it is significant.

I have looked at this particular plan with those particular criteria in mind and I am satisfied that the plan satisfies those requirements. I believe that the first element of the statute is embraced by the plan itself, and the second is addressed in section four. The third element, I believe, is satisfied by 6.1.1, and although there is, and I'm referring now to the agreement implementing the plan, and although there is no reference in the plan to relocation component, which is the third component, it's not necessary that there be any, since there are no residents in the redevelopment area that will require relocation.

. . . .

Item four in Section 7 is property to be acquired, and that I believe to be adequately dealt with in a variety of sections, 4.3, 4.7.1, 6.1.1, 6.1.2.

The final component is the master plan contingency. There is no requirement that the plan not impact on other master plans, it simply indicates, that if there is a significant impact or relationship, then you need to mention it. In this case, that was addressed in the hearings that were dealt with, and I believe properly considered by the—by the City[.]

*N.J.S.A.* 40A:12A–7(a)(1)–(5) requires only that the plan contain "an outline" addressing the five issues described above. The plan addressed these issues adequately. The first issue, the plan's relationship to local objectives as to land uses, population density, improved traffic and public transportation, public utilities, recreation and community facilities and other public improvements, is addressed in Sections 1.4, 3.3, 3.4, 3.5, 3.6.2, 4.1, 4.3 and 4.6.1 of the plan. Nevertheless, plaintiffs argue that the plan establishes only "stark objectives" as to the goals it will achieve without stating how the objectives will be met. True, but the Act requires only "an outline" of how the objectives are to be met; it does not require the type of detail plaintiffs suggest must be included therein. In any event, it is clear that the unhealthy and unsafe conditions at the site included, at least in part, the pre-existing landfill.

The second issue to be addressed in the plan, i.e., proposed land uses and building requirements, is addressed in Section 4 of the plan. The issue of adequate provisions for the relocation of

displaced residents in the project area, did not need to be addressed, since as the court found, there were no residents in the plan's Huron North project area. The fourth issue, the identity of property proposed for acquisition, is addressed in Sections 4.3 and 6.1. The last category, relationship of the plan to the master plan of nearby municipalities, the county and the state, is not relevant since plaintiffs point to no such relationships which they claim do exist, and there appears to be little relationship between the plan and the master plans of other cities, the county or the state.

## V

■ Plaintiffs maintain that the Redeveloper's Agreement contained so many contingencies that it was illusory and must be voided. They urge that due to various conditions, the agreement failed to contain sufficient controls to insure that the public purposes to be furthered by the agreement would be fulfilled, in violation of *Roe v. Kervick, supra.* Plaintiffs point to the provisions involving MRI's ability to terminate the agreement if: (1) it determines that environmental remediation costs at the site are too high; (2) it cannot obtain title insurance without exceptions or conditions; and (3) the Westside Bypass is not built.

■ An illusory promise has been defined as, a "promise which by [its] terms make[s] performance entirely optional with the 'promisor' whatever may happen, or whatever course of conduct in other respects he may pursue[.]" *Restatement (Second) of Contracts,* § 2, comment e (1979). Our courts have adopted that definition. *Curtis Elevator Co. v. Hampshire House, Inc.,* 142 *N.J.Super.* 537, 542, 362 *A.2d* 73 (Law Div.1976). Hence, an illusory promise is one in which the "promisor has committed himself not at all." J.D. Calamari and Joseph M. Perillo, *Contracts,* § 4–17 at 159 (2d ed.1977). Thus, if performance of an apparent promise is entirely optional with a promisor, the promise is deemed illusory. *Id.* at 160.

A promise is not illusory "if the power to terminate is conditioned upon some factor outside the promisor's unfettered discretion, such as the promisee's non-performance, or the happening of some event such as a strike, war, decline in business, etc." *Id.* at 161. In general, our courts should seek to avoid interpreting a contract such that it is deemed illusory. *Russell v. Princeton Lab., Inc.,* 50 *N.J.* 30, 38, 231 *A.*2d 800 (1967); *Nolan v. Control Data Corp.,* 243 *N.J.Super.* 420, 431, 579 *A.*2d 1252 (App.Div.1990).

We conclude that, as modified, the contingencies in the Redeveloper's Agreement which plaintiffs assert make it illusory do not give MRI the unfettered discretion to terminate. MRI can terminate based on the remediation cost condition only if the costs of remediation are unreasonable. This contingency now carries with it the court imposed "good faith" requirement, such that MRI can terminate the agreement, based on the contingency of Section 4.3, only if the costs of remediation are objectively determined to be too high.[2]

Similarly, termination based on the title insurance clause, Section 7.0, is "conditioned upon a factor outside the promisor's unfettered discretion," here the good faith inability to cure all title deficiencies. The agreement provides that MRI can terminate only if it cannot cure all title deficiencies. Therefore, this clause does not make the Redeveloper's Agreement illusory.

Lastly, construction of the Westside Bypass is clearly outside MRI's discretion, and termination based on that clause can occur only if construction of the bypass does not occur. Thus, there are no clauses within the Redeveloper's Agreement which gives MRI the unfettered discretion to unilaterally terminate the agreement,

---

[2] Following oral argument, we were supplied with an amendment to the May 3, 1996 agreement, between the City and MRI, dated January 8, 1998, that imposed upon the redeveloper, MAC, Corp. (successor by assignment to MRI) the "implied duty of good faith and fair dealing with respect to its determination whether the costs of remediation (referred to in the last sentence of Section 4.3 of the Agreement) are unreasonable."

except upon the occurrence or non-occurrence of certain events outside MRI's control. Therefore, the agreement is not illusory.

Judge Gibson noted that there was nothing improper because the agreement contained several contingencies. He indicated that he could not imagine a developer agreeing to spend many millions of dollars on a project without certain contingencies. Specifically, with respect to the Westside Bypass contingency, he noted that it was reasonable for MRI to agree to commit millions of dollars towards construction of the planned resort at Huron North only if the bypass were built. Moreover, if MRI does terminate the contract for failure to meet one of these contingencies, the land reverts back to the City. In that event, the City would still have collected some tax revenues from the property, thereby fulfilling a public purpose.[3]

Judge Gibson in addressing the second prong of the *Roe v. Kervick* test, stated:

In this case, there are controls, and I'm satisfied that those controls are adequate. But they need not be measured in their adequacy against other types of projects that might require more. For example, just converting this property back onto the tax rolls is one of the key components of the public purpose here. That's going to be achieved as soon as there is a closing under the contract. Once there is a closing under this contract, this developer will have to begin to pay taxes to the City of Atlantic City. That's day one, that's without one brick being placed on this site for purposes of a casino. So that public purpose, it seems to me, is going to be achieved very quickly, and therefore, the, quote, controls necessary to make that happen are clearly built in this agreement and require no more than a closing. Now, obviously this project contemplates more than that, and the more that it does contemplate does require further controls. But if you look through this agreement, there are extensive controls that will maximize the probabilities of the developer fulfilling this project. Now, there is no guarantee, there is no guarantee that this project is going to be built. There is no guarantee that any project will ever been [sic] built. There is no contract that can create such a guarantee, none that I know of. All that a contract can reasonably do is to contain sufficient controls to maximize that chance and that probability, and in my judgment, this one does that.... There is also statutory provisions that impact on what can be done here, both through zoning and through the Casino Control Commission which will have a large say in what occurs on the site and how it is fulfilled, and how it is run, all of

---

[3] We were advised at oral argument that pursuant to the amended Agreement, the closing of title has taken place and taxes are now being paid to the City.

which impact on the means to achieve this public purpose. So I'm satisfied that the combination of controls is sufficient to satisfy the means part of the test under *Roe v. Kervick.*

We agree with Judge Gibson. The agreement arguably does provide adequate guarantees that it will fulfill the public purposes related to development of Huron North. The means selected to fulfill a public purpose are presumed to be valid, and reasonably conflicting doubts should be resolved in favor of the agreement's validity. *See Roe v. Kervick, supra,* 42 *N.J.* at 229, 199 *A.*2d 834. The judge correctly held that the existence of these contingencies does not make the agreement illusory.

## VI

Plaintiffs also contend that since neither the Redevelopment Plan, the RFQ issued by the City to attract developers, or MRI's response to the RFQ contained any discussion of transportation issues, any discussions between MRI and the City regarding the Westside Bypass exceeded the scope of both the Redevelopment Plan and City Council Resolution No. 594, which authorized negotiations between MRI and the City regarding establishment of a redeveloper's agreement. Therefore, plaintiffs assert that those negotiations were ultra vires and should render the Redeveloper's Agreement null and void.

The Redevelopment Plan prepared and approved by the Planning Board, as adopted by Ordinance No. 28, did not discuss the need for a roadway connecting the Atlantic City Expressway and downtown area to the marina area. The RFQ issued to solicit bids for construction of the proposed entertainment center at Huron North also did not address this issue; neither did MRI's response to the RFQ. Similarly, City Council Resolution No. 594, which authorized negotiations regarding establishment of a Redeveloper's Agreement between MRI and the City, did not address this issue.

In rejecting appellants' position, Judge Gibson held:

Number one, there is no statutory requirement that the City use the RFQ as a means of soliciting bids, so there is no particular statutory requirement for what an RFQ must contain. What is clear is that under [*N.J.S.A.*] 40A:12A–4(c) and 12A:8(g), the city may not only convey property without public bidding, but it may do so upon terms that it deems to be reasonable, so it's clear that no public bidding is necessary, and it's also clear that it may do so, I think, without full market value consideration, but I'll treat that separately in another count.

In this case, the RFQ was an invitation to bidders. It was understandably general in its nature and merely sought proposals with respect to the redevelopment plan. It must be remembered that there were only two bidders that responded to it. And those bids were as I previously described, so I believe that the generalized nature, although there were sufficient specifics, I think, to satisfy the statute, I believe that that generalized nature is adequate. It also must be remembered that in connection with the specific complaint that the plaintiffs ultimately make regarding the tunnel—well, let me pass the tunnel for the moment. With respect to the transfer of public property and the no consideration claim, neither of these proposals contemplate paying the city money. As a matter of fact, as I mentioned earlier, the MLA proposal contemplated that the City would waive municipal taxes for a period of 20 years.

The contingencies that ultimately were included in the agreement need not have been in the RFQ, in my judgment. I believe those contingencies were a part of the negotiating process that would ultimately, and by necessity, have to come later, and I believe contingencies are a normal part of that negotiating process. So stated differently, I do not believe that the memorandum of understanding, or the RFQ itself, needed to include all of the potential contingencies that this agreement to redevelop this site might ultimately contain.

We adopt his holding on this issue. The Act contains no requirement that an RFQ be issued or that any Redeveloper's Agreement ultimately agreed upon must conform to it. Rather, *N.J.S.A.* 40A:12A–8(m) simply provides that the municipality or redevelopment agency can "publish and disseminate information concerning any redevelopment area, plan or project." The RFQ was essentially a request for proposals and was not intended to address specific issues such as the creation of a roadway leading to the marina district.

Plaintiffs challenge based on Resolution No. 594 is similarly without merit. The Act authorizes a municipality to enter into a redeveloper's agreement with the entity selected for redeveloping the area in need of rehabilitation. *N.J.S.A.* 40A:12A–4(c); *N.J.S.A.* 40A:12A–8(f). However, nothing in the Act requires that

the authorizing resolution must address all of the terms ultimately included within that agreement.

It is unrealistic that the City Council could have foreseen all of the issues which needed to be addressed in the redeveloper's agreement before negotiations with the selected redeveloper even commenced. Resolution No. 594 noted that MRI was selected as the redeveloper, authorized the City to negotiate with MRI regarding an MOU and subsequent Redeveloper's Agreement "in conformance with the concept plan submitted by [MRI] as part of its RFQ response," and established the time table for the completion of negotiations regarding the MOU and Redeveloper's Agreement. Issues such as remediation of the landfill and the creation of several thousand jobs as set forth in the Redeveloper's Agreement, were not included in the resolution either. We reject plaintiffs' assertion of such a requirement.

## VII

We next consider plaintiffs' assertion that the judge erred in concluding that since Horace Bryant Drive was not within the "project area," there was no requirement that the Redevelopment Plan for Huron North contain a relocation plan for residents of that roadway who would be displaced by construction of the Westside Bypass. Several statutory provisions are implicated.

*N.J.S.A.* 40A:12A–7(a) provides that a municipal governing body can adopt an ordinance identifying a "delineated *project area* " (emphasis added) located within an area in need of redevelopment or an area in need of rehabilitation, or both. Pursuant to *N.J.S.A.* 40A:12A–7(a)(3), a "Redevelopment Plan" must make:

> Adequate provision for the temporary and permanent relocation, as necessary, *of residents in the project area,* including an estimate of the extent to which decent, safe and sanitary dwelling units affordable to displaced residents will be available to them in the existing local housing market.
>
> [Emphasis added].

A redevelopment plan is a plan adopted for the redevelopment or rehabilitation of "all *or any part of* a redevelopment area, or an

area in need of rehabilitation[.]" *N.J.S.A.* 40A:12A–3 (emphasis added). A municipality determines which areas are in need of rehabilitation. *N.J.S.A.* 40A:12A–14.

Atlantic City first approved Resolution No. 889, finding the entire City to be in an area in need of rehabilitation. Later, City Council adopted Resolution No. 131, which more particularly identified Huron North as a *project area* in need of rehabilitation. Ordinance No. 28 was adopted subsequently by City Council, which adopted the Redevelopment Plan prepared and approved by the Planning Board. The Redevelopment Plan adopted identified Huron North as the project area. It noted that certain city facilities located within the project area would need to be relocated, but did not mention construction of the Westside Bypass at all.

As the delineated project area was clearly identified as the Huron North site, no relocation of residents is required in that site, since none lived there. Moreover, as the project area in need of redevelopment is limited to Huron North, it would appear that the City is without authority to acquire the property of those being displaced outside of that project area. *N.J.S.A.* 40A:12A–15.

Any relocation from Bryant Drive will be required not because of the City's action, but because of the State's; that is, it is the State's action in approving and funding construction of the Westside Bypass. If the municipality is to be responsible for the residents of areas displaced as a consequence of the State's improvement to the infra-structure which are needed to support such municipal rehabilitation, the Legislature must specifically so provide. It has not yet done so.

### VIII

Appellants contend that the judge inappropriately applied the relevant standard in granting summary judgment to respondents and that the judge made unsupported assumptions and findings of fact. We find no merit to these contentions. *Rule* 2:11–3(e)(1)(E);

*Brill v. Guardian Life Ins. Co.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

## IX

Lastly, plaintiffs contend that the judge erred in reforming the Redeveloper's Agreement between the City and MRI. They focus on two provisions of the contract, the first involving MRI's ability to reconvey Huron North to another entity without first obtaining the City's written permission, and the second pertaining to MRI's right to terminate the contract, at its sole discretion, should it determine that remediation costs are too high.

Regarding the latter, we do not consider the court to have reformed the agreement in reading a "good faith" component into the clause permitting MRI to terminate the contract should it deem environmental remediation costs at the site unreasonable. As we discussed earlier, such an interpretation constitutes a reasonable legal interpretation of the provision. An implied covenant of "good faith and fair dealing" exists in every contract. *Sons of Thunder, Inc. v. Borden, Inc.*, 148 *N.J.* 396, 420, 690 *A.*2d 575 (1997); *Pickett v. Lloyd's*, 131 *N.J.* 457, 467, 621 *A.*2d 445 (1993). This implied covenant requires the performance of a contract's provisions in good faith. *Sons of Thunder, supra*, 148 *N.J.* at 421, 690 *A.*2d 575.

As to plaintiffs' contention that Section 5.5 of the Redeveloper's Agreement was in violation of *N.J.S.A.* 40A:12A–9(a), which provides in relevant part that any agreement reached between a municipality and redeveloper shall contain a provision providing that, "the redeveloper[s] shall be without power to sell, lease or otherwise transfer the redevelopment area or project, or any part thereof, without the written consent of the municipality or redevelopment entity . . . ," we agree, as did Judge Gibson.

In contravention of the Act, Section 5.5 of the Redeveloper's Agreement, at the time of Judge Gibson's decision, provided:

After the conveyance of the Project Parcels to the Redeveloper, the Redeveloper may convey all or part of the Project Parcels to one or more third parties, or the Redeveloper may enter into a joint venture with one or more third parties, for the purposes of the development and completion of the project, each for such consideration and on such terms and conditions as the Redeveloper may determine in its sole discretion. The City agrees that the Redeveloper is permitted to reconvey all or part of the Project Parcels to, or joint venture with, a third party on the condition that the Project is completed in accordance with the other provisions of this Agreement. The Redeveloper agrees, in the event that all or part of the project parcels are conveyed or otherwise utilized by the Redeveloper as part of a joint venture or similar joint business undertaking for purposes of developing the Project or otherwise developing the Site, that it will proceed as envisioned by this Agreement, or will make, as a condition of any conveyance to, or joint venture with any third party, the completion of the Project and the development of the Site in accordance with the Redeveloper's initial development and design concept or development and design concept substantially similar to same and consistent with the goals set forth in the RFQ and the Redevelopment Plan including the requirement that at least one casino hotel be planned for the Site. In connection with such a conveyance, the Redeveloper shall remain as the primary Redeveloper of the Site or shall be replaced by an individual or entity holding a license granted by the New Jersey Control Commission ("CCC") to own or operate a casino hotel or found qualified by the CCC to hold such a license.

Judge Gibson held that the statute envisioned a two-step process: i.e., after the agreement to reconvey is reached, the City must be given a separate opportunity to consider the redeveloper's desire to reconvey. Although he found that Section 5.5 was violative of the Act, he observed that:

there is adequate authority for the Court to read into this agreement the necessary controls that would have to be part of this plan and project. I think that given the authority of a Court to interpret an agreement as conforming, that is, interpret government actions as conforming with the statute allows me to read this provision as contemplating a two-step process. However, if there is some question about the Court's ability to do that, I think its academic in this case. I think its academic in this case because in this case the parties to this agreement have already agreed that the Court can do that, and accordingly, the Court will read into this agreement a provision that requires the City to separately approve this project—I'm sorry, approve this reconveyance if, in fact, there is to be a reconveyance.

Therefore, the final judgment explicitly provided that Section 5.5 was reformed to the extent that MRI would have to obtain the City's written consent if it sought to sell, lease or otherwise transfer the property to another redeveloper.

The January 8, 1998 amendment to the Redevelopment Agreement provides:

Pursuant to the Judgment, in the event that the Redeveloper desires to sell, lease or otherwise transfer the Project Parcels or the Project or any part thereof prior to completion of construction of the Project, the Redeveloper shall first obtain the written consent of the City; and in the event the Redeveloper so requests the written consent of the City, the City shall act reasonably under the circumstances and shall not unreasonably withhold its consent.

A contract provision that is contrary to the requirements of a statute is void. *American Casualty Co. of Reading, Pa. v. Resolution Trust Corp.,* 839 *F.Supp.* 282, 286 (D.N.J.1993); *Naseef v. Cord, Inc.,* 90 *N.J.Super.* 135, 142, 216 *A.*2d 413 (App.Div.), *aff'd,* 48 *N.J.* 317, 225 *A.*2d 343 (1966). *N.J.S.A.* 40A:12A–9(a) explicitly provides that a redeveloper's agreement must permit a municipality to consent in writing to any subsequent reconveyance of the property by the redeveloper. As Section 5.5 of the original agreement did not so provide, it violated the statute, and hence was void.

It is well established that a court can sever an illegal portion of a contract that does not defeat the agreement's central purpose. *Jacob v. Norris, McLaughlin & Marcus,* 128 *N.J.* 10, 33, 607 *A.*2d 142 (1992). Here, Section 10.5.4 of the Redeveloper's Agreement provides that if any provision therein is deemed by a court to be in violation of any applicable law, that provision can be severed without affecting the validity of the remainder of the agreement, so long as the court's determination does not prohibit the conveyance of the property to MRI. We are satisfied, as were the parties, that severing Section 5.5 would not defeat the agreement's central purpose, and was, therefore, severable. Atlantic City and MRI's apparent amenability to Judge Gibson's reformation of Section 5.5 and their subsequent amendment of the agreement supports our belief that the provision is not so vital that its severance as void would frustrate the agreement's purposes.

Although we do not approve of Judge Gibson's reformation of the provision, reversal is not required, as the judgment of a lower court can be affirmed even if on grounds different than those relied upon below. *Isko v. Planning Bd. of Livingston,* 51

*N.J.* 162, 175, 238 *A.*2d 457 (1968). The agreement, as amended by the severance, is deemed otherwise valid.

We, therefore, affirm. However, the judgment is modified to provide that the original Section 5.5 is void and severed from the Redeveloper's Agreement.

Affirmed, as modified.