928 A.2d 856 (2007)
395 N.J. Super. 230
VINELAND CONSTRUCTION COMPANY, INC., Plaintiff-Appellant,
v.
TOWNSHIP OF PENNSAUKEN, Defendant-Respondent, and
Cherokee Pennsauken, LLC, Defendant/Intervenor-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued March 6, 2007.
Decided July 27, 2007.
*858 Lloyd D. Levenson argued the cause for appellant (Cooper Levenson April Niedelman & Wagenheim, attorneys; Mr. Levenson, Gerard W. Quinn and William J. Hughes, Jr., Atlantic City, on the brief).
Mark P. Asselta, Westmont, and Jeffrey D. Smith, Teaneck, argued the cause for respondent Township of Pennsauken (Brown & Connery and Parker McCay, attorneys; Mr. Asselta and William M. Tambussi, Westmont, on the joint brief).
Jeffrey D. Smith argued the cause for intervenor-respondent Cherokee Pennsauken, LLC (DeCotiis, Fitzpatrick, Cole & Wisler, attorneys; Mr. Smith and Victoria A. Flynn, Teaneck, on the joint brief).
Before Judges LISA, HOLSTON, Jr. and GRALL.
The opinion of the court was delivered by
LISA, J.A.D.
Plaintiff, Vineland Construction Company, Inc., a property owner in Pennsauken Township, challenges the Township's designation of Cherokee Pennsauken, LLC (Cherokee), as master redeveloper for the Township's redevelopment plan for approximately 600 acres of waterfront property along the Delaware River, including plaintiff's 137 acres. Plaintiff does not challenge the Township's determination that the property within the redevelopment area (including plaintiff's property) is in need of redevelopment, nor does it challenge the Township's redevelopment plan.[1]
Prior to the designation of Cherokee, plaintiff had engaged in contract negotiations with the Township for the right to redevelop its own property and an adjoining property consistent with the redevelopment plan. Plaintiff contended the Township's designation of Cherokee was a result of political favoritism and that it should be permitted to redevelop its own property. Plaintiff therefore sought to enjoin Cherokee's anticipated condemnation[2] *859 and redevelopment of plaintiff's property, contending this would amount to an unconstitutional taking.[3]
Following a ten-day bench trial, Judge Orlando issued a comprehensive written decision finding no violation of statutory or constitutional law in connection with the Township's designation of Cherokee as master redeveloper and the potential condemnation of plaintiff's property. He therefore entered an order dismissing plaintiff's unconstitutional taking claim and its claim premised upon alleged political impropriety.
On appeal, plaintiff argues that the trial court erred by rejecting plaintiff's constitutional challenges to the designation of Cherokee as master redeveloper and by finding that the designation of Cherokee was neither arbitrary, capricious nor unreasonable, and therefore, entitled to deference. Plaintiff also argues that critical factual findings by the trial court were clearly erroneous. We reject these arguments. From our review of the record we are satisfied that the trial court's factual findings are supported by substantial credible evidence in the record as a whole. See Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974). We are further satisfied that the trial court correctly applied the controlling legal principles in reaching its conclusion. Therefore, we affirm.

I
We set forth a detailed recitation of the facts, as established at trial, to provide context to the appeal issues. The Township's waterfront includes most of the Delaware River frontage between the Benjamin Franklin and Betsy Ross bridges connecting Camden and Pennsauken, respectively, to Philadelphia. Camden lies to the south of this area. Revitalization of the Township's waterfront was one of the objectives set forth in its 1998 master plan.
Plaintiff, a closely-held real estate development and construction firm, purchased 137 acres of land along the Pennsauken waterfront in 1972. It converted an existing manufacturing facility into a 300,000 square foot warehouse distribution center and leased space to various businesses. As of 2003, plaintiff's warehouse facility was occupied by two tenants; a three-story office building on the property was vacant; and another small building was being used as "a kind of shop." The property contains wetlands.
In 1990, plaintiff learned that the prior owners' manufacturing operation, which involved the application of porcelain enamel to cast iron bathtubs, had contaminated the soil. In 1996, plaintiff reached a settlement with the prior owners regarding remediation of the property, which was ongoing at the time of trial.
On June 5, 2001, following an investigation and a public hearing, the Planning Board adopted a resolution finding over 600 acres of waterfront property along the Delaware River, including plaintiff's property, in need of redevelopment pursuant to the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 to -73 (LRHL). *860 In particular, the Board found the existence of conditions set forth in N.J.S.A. 40A:12A-5b, c, d and e, in support of its determination.
The redevelopment area was largely comprised of four properties commonly referred to as Petty's Island, owned by CITGO; Vineland Construction, owned by plaintiff; the Acme Site, owned by the Township; and the Hess/Texaco site, which was comprised of two parcels owned by the Hess and Texaco oil companies. The redevelopment area also encompassed a number of smaller properties, including a small junkyard located adjacent to plaintiff's property, known as the Parisi site.
Petty's Island is an island in the Delaware River. It is elongated and stretches southward from the Pennsauken mainland such that its location in the river runs parallel to and is directly across from the Cramer Hill section of Camden, which fronts the river. A bridge connects the northern tip of Petty's Island with plaintiff's property on the mainland, which borders the Cramer Hill section of Camden. The Acme site is across the street from plaintiff's and Parisi's property. The Hess/Texaco site is north of the other sites. It is separated from plaintiff's property by a cove etched out in the river, such that the two sites face each other across the cove in a generally North-South direction. The two sites are not contiguous, but are connected by a road on the mainland running along the cove.
On June 6, 2001, the Township approved the resolution of the Planning Board. On June 27, 2001, the Township adopted an ordinance adopting a redevelopment plan prepared by its planning consultant, Marc R. Shuster. The objectives of the redevelopment plan included the "environmental rehabilitation of existing compromised sites" and the development of "a unique mix of land uses designed for the particular characteristics of the area." The potential uses contemplated by the plan included "marine oriented uses, general athletic fields, lodging, institutional/governmental uses, retail, educational facilities, dining, and active and passive recreational uses."
In addition, the redevelopment plan authorized the Township to enter into a contract with a redeveloper if "necessary" for the implementation of the plan. The Township was also given "the option of negotiating with private-sector developers for a payment-in-lieu-of-taxes . . . for appropriate developments under this plan."
In 2002, the Township learned that an active bald-eagle nest had been discovered on Petty's Island. As a result, the State Department of Environmental Protection (DEP) urged the Township to adopt a coordinated approach in implementing its redevelopment plan in order to manage the eagle habitat consistent with various regulations governing endangered species.
The Township retained Louis Bezich, a planning consultant, to manage the redevelopment project and to meet with potential redevelopers. Over the next few years, the Township engaged in discussions with at least four potential redevelopers and reviewed several redevelopment proposals for various sites within the redevelopment area, including proposals submitted by plaintiff. There is no dispute that plaintiff dedicated considerable resources and effort to the development of a redevelopment proposal for its property.
John Krauser, plaintiff's President and Chief Operating Officer, testified that after reviewing the Township's redevelopment plan in December 2001, he initiated discussions with the Township regarding the Township's intentions with respect to plaintiff's property. Plaintiff initially offered to sell its property to the Township. *861 However, by January 2002, Krauser had assembled a "team" to evaluate whether plaintiff should instead undertake the redevelopment of its property. In addition to Krauser, the team included an outside attorney, Catherine Ward, of the Cooper Levenson firm; a redevelopment planner, Angelo Alberto; engineers, Sadat Associates, Inc.; and a wetlands expert, Princeton Hydro.
According to Krauser, by August 2002, plaintiff had decided to undertake the redevelopment of its property. Plaintiff contemplated a mixed-use redevelopment for its property including residential, commercial and retail uses. According to Alberto, plaintiff was primarily an industrial developer and did not have expertise in redevelopment projects involving smart growth principles. Alberto was retained because of his expertise in mixed use redevelopment. Therefore, Alberto arranged for plaintiff's redevelopment team to visit various other redevelopment projects throughout the State having characteristics similar to its proposal.
Over the next two years, there were numerous meetings between plaintiff's representatives and the Township, and many written and oral communications. Until Cherokee expressed an interest in undertaking the redevelopment project, the Township continued to encourage plaintiff to refine its plan.
In March 2003, plaintiff presented to the Township concept plans for the redevelopment of its property. The Township's response was favorable and Bezich asked plaintiff to consider the possibility of developing some portion of the Acme site, which had already been acquired by the Township. This favorable response prompted plaintiff to further refine its plan and to explore the process for securing the appropriate permits from regulatory agencies. During a July 2003 meeting, plaintiff presented a revised concept plan to the Township. Again, the Township's response was favorable. There was also some discussion regarding the possible inclusion of the Parisi site in plaintiff's plan. According to Ward, the Township was eager to eliminate the Parisi "junkyard operation." However, plaintiff could not acquire the Parisi site through condemnation for inclusion in its project unless it entered into a redevelopment agreement with the Township.
Accordingly, on August 8, 2003, the Township's redevelopment counsel sent Ward a draft of a redevelopment agreement between the Township and plaintiff. The draft redevelopment agreement was not complete. The provisions pertaining to the improvements to be constructed and the acquisition costs for the Parisi property were left blank. Also, the three exhibits referred to in the draft agreement did not exist and remained to be negotiated. The exhibits were to include a "purchase and sale agreement" to be prepared by the Township and the redevelopment project plan to be prepared by plaintiff.
In September 2003, Bezich advised Ward that another redeveloper had proposed a "co-generation" facility for the Texaco-Hess site. According to Ward, plaintiff was strongly opposed to any industrial development of the other sites. Accordingly, on September 19, 2003, Ward drafted, but did not deliver, a letter to the Township withdrawing plaintiff's proposal to redevelop its property as a "mixed use development" on the basis that the proposal was "highly dependent on the entire waterfront redevelopment area being redeveloped in a similar manner," and that the Township's master plan demonstrated "no synergy and no consistency, just haphazard uses." In Ward's view, the Township did not share plaintiff's "vision" for the *862 entire waterfront and plaintiff's parcel could not "stand alone."
According to Krauser, the letter was not sent to the Township because he did not want to end negotiations and "the language was too harsh." Nonetheless, in September 2003, Krauser informed Alberto that the redevelopment project was "on hold" and that Alberto would not be paid for any additional work. Although Krauser maintained that plaintiff was always "prepared to go forward" with the project, he acknowledged that plaintiff's commitment was not unequivocal, in that it depended upon market conditions.
While there continued to be some communication between plaintiff and the Township during 2003, the frequency of their meetings slowed, plaintiff did not submit additional concept plans, and there were no further negotiations regarding the unresolved terms of the draft redevelopment agreement. Also, plaintiff and the Township had reached an impasse regarding plaintiff's plan to use dredge in carrying out the proposed redevelopment. In light of these developments, Township officials were not convinced that plaintiff was capable of, or committed to, carrying out the proposed redevelopment of its property.
Meanwhile, during 2003, Cherokee, an experienced redeveloper of brownfield sites in major urban areas, was involved in negotiations with Camden officials regarding its potential designation as master redeveloper for the "Cramer Hill Redevelopment Project." Cherokee was ultimately named master redeveloper for the Cramer Hill project. While evaluating the development potential of the Cramer Hill site, Cherokee became interested in the potential for the complementary development of Petty's Island.
In early December 2003, David Luthman, the Township attorney, was contacted by Joseph Salema, a Cherokee consultant, regarding Cherokee's interest in the Petty's Island site. Luthman acknowledged that he had known Salema for years and greatly respected him. Therefore, Luthman immediately scheduled a meeting between representatives of the Township and Cherokee for December 18, 2003. At this meeting, Cherokee expressed its interest in the complementary redevelopment of Petty's Island in conjunction with the Camden project. Cherokee described its experience in redeveloping brownfields, as well as its financial strength. The Township's representatives were impressed with Cherokee's credentials and financial capability, and asked Cherokee to consider submitting a redevelopment proposal for the entire waterfront redevelopment project. Anselm Fusco, a Cherokee senior vice president, agreed to present the Township's request to Cherokee. He indicated that the Township could anticipate a prompt response because Cherokee had already conducted related research regarding the development potential of the Delaware waterfront in conjunction with its work on the Camden project.
On December 29, 2003, Luthman reported on his discussions with Cherokee during a Township meeting. Given the difficulties posed by the discovery of the bald eagle nest on Petty's Island, as well as the lack of any other private proposals for the development of the Petty's Island site, Luthman urged the Township to negotiate a redevelopment agreement with Cherokee.
In January 2004, Cherokee advised the Township that it was interested in undertaking the entire waterfront development project on condition that it be named sole redeveloper. Cherokee stressed that it would be to the Township's advantage to have a single redeveloper. Fusco conveyed to Township officials the many benefits of working with a single redeveloper *863 such as Cherokee, including efficiencies in terms of scheduling and costs, which would make it more likely that the project would succeed and have a positive financial impact on the Township. From a fiscal perspective, the success of the project depended upon the Township being able to garner sufficient revenues from tax ratables to offset the financial impact of development, such as additional roads to maintain and more children to educate. Accordingly, Cherokee conducted a fiscal analysis projecting these variables over the ten-year period it would take to complete the project. This analysis ensured that the Township would not find itself in the position of having "10,000 kids in their school system and . . . marginal tax ratables."
Fusco also informed Township officials of the many advantages of having Cherokee coordinate different aspects of the project, such as engineering and remediation contracts, impact litigation, and infrastructure improvement. Fusco emphasized that a coordinated and coherent approach was crucial in dealing with environmental and ecological issues. Because of Cherokee's supervision of the Camden project, Fusco believed it was in an ideal position to facilitate "habitat management" or "the treatment of the ecosystem, the waterfront area and all of the areas that eagles roost and forage." Having control over two large projects enhanced Cherokee's ability to mitigate the effects of development by preserving large swaths of wetlands. Multiple developers would be less likely to allow large portions of their respective properties to be preserved for wetlands. A single developer would be in a better position to identify and commit a portion of the development area for wetlands to balance out development in another portion.
In addition, Fusco explained that Cherokee would assign case managers to deal with each regulatory agency, facilitating the permitting process. Because these case managers would be operating "under an umbrella of a single effort," there would be benefits "in terms of continuity of regulatory approach," "consistency of remedial strategy," and "the efficiency with which the regulators can operate."
According to Fusco, there were also significant advantages to having a single developer deal with infrastructure issues. For example, each site would need adequate sewage. The municipality would be responsible for maintaining the existing sewer infrastructure, while a State agency would be processing all new sewage applications. Having a single developer to coordinate sewage activity would be much more effective because "there is a single hand driving the design, driving the implementation, coordinating and controlling the schedule, being able to speak to how the project is phased in over time, so that demand is anticipated and the right improvements are made in a logical sequence."
Although Cherokee requested that it be named conditional redeveloper by January 28, 2004, the Township demurred, asking that Cherokee first submit a statement of qualifications and formal proposal for the waterfront redevelopment project.
In 2004, when Krauser became aware that the Township was involved in negotiations with another redeveloper, he sent the Township a signed copy of the draft redevelopment agreement, but he first deleted the word "draft." Krauser did not include any of the exhibits referred to in the agreement. He acknowledged that plaintiff was not prepared to complete construction before December 31, 2005, as stated in the agreement. Nonetheless, Krauser claimed that he intended that this agreement would bind the parties.
*864 Following the Township's rejection of the draft agreement, plaintiff filed this action on April 23, 2004 seeking to enjoin the Township from designating Cherokee as master redeveloper, essentially on the basis that plaintiff already had an agreement with the Township for the redevelopment of its own property.
On May 21, 2004, Cherokee submitted a formal redevelopment proposal to the Township. Cherokee and its subsidiaries were described as "the world's largest private sector investor in brownfield redevelopment projects." Since 1990, Cherokee had "invested in more than 300 properties in 40 separate transactions." In 2003, Cherokee raised $620 million in equity for investment in projects around the world. Cherokee's portfolio of projects included industrial, office, hotel and residential properties. It preferred "to invest in large brownfield sites in major urban areas where municipal and state officials and regulators are committed to brownfield redevelopment." Cherokee had "converted 17,000 acres of contaminated land into productive remediated property, . . . generat[ing] $56 million of annual property taxes and $18 million of annual sales tax revenues." In addition to the Cramer Hill project, Cherokee was the redeveloper for the Meadowlands golf redevelopment project, described as the "largest brownfield and landfill remediation project currently being undertaken in the United States." The Meadowlands project involved complex legal, regulatory and financial issues similar to those likely to arise in connection with the Township's waterfront redevelopment project.
Cherokee represented that it had carefully crafted the Camden and Pennsauken redevelopment proposals to complement one another to "ensure the coherent and coordinated restoration and redevelopment of nearly ten miles of shoreline between the Benjamin Franklin and Betsy Ross bridges." It posited that the "ecological and planning benefits of such a regional approach to brownfield redevelopment will accrue to the environment and to the people of Pennsauken and the region for generations to come." With respect to the Petty's Island site, Cherokee proposed to develop a hotel/conference center, a golf course, and low density residential housing which would be designed to protect the bald eagle habitat.
Cherokee estimated that the total cost of the waterfront redevelopment project would exceed $770 million. Cherokee and its development partners planned to provide all of the invested capital, to contribute $20 million to the construction of a municipal recreation center, parks and open space, and to assume the cost of any properties acquired by the Township through eminent domain. In return, the redevelopment proposal required the Township to implement a tax securitization financing program and to grant Cherokee various development rights for residential housing, hotels, office space, retail space, and a golf course.
Cherokee's proposal also contemplated execution of an escrow agreement, by which Cherokee would "provide all funds necessary for the preliminary acquisition of properties and other activities associated with the development of the waterfront." The escrow agreement precluded the Township from negotiating with any other party for the redevelopment of any property within the waterfront redevelopment area.
Cherokee anticipated that it would be able to complete the entire project within eight years.
Luthman urged the Township to designate Cherokee as master redeveloper because of the "tremendous benefits" of having a single redeveloper for the entire *865 waterfront. As master redeveloper, Cherokee would be able to take a "regional approach" to the bald eagle and wetlands problems. In Luthman's opinion it would be very difficult for the Township to implement a "regional approach" if different parcels were redeveloped by separate developers. For example, he observed that because some of the redevelopment area's extensive wetlands would have to be filled in, other wetlands would have to be set aside for remediation. If there were separate developers, it would be difficult to resolve wetland remediation problems as nobody would want "to give up part of their potential redevelopment parcel." Aside from these concerns, Luthman pointed out that there was no private interest in the redevelopment of Petty's Island, the only proposal for the Texaco site was for the development of an ethanol refinery, which was not consistent with the Township's vision for the waterfront, and that negotiations with plaintiff had stalled.
On May 26, 2004, the Township adopted a resolution conditionally designating Cherokee as master redeveloper. The resolution stated that the redevelopment area was comprised of "environmentally compromised properties including Brownsfields [sic] and other former industrial sites which present unique environmental and other challenges to proper redevelopment." It recited that over a period of several years, the Township had considered the proposals of various potential redevelopers and ultimately concluded that a partnership with Cherokee was in the public interest given its reputation and experience. The resolution noted that Cherokee was "a nationally recognized redeveloper of Brownsfields [sic] and other industrially contaminated sites." In addition, the Township approved of Cherokee's plans to "provide public access to the waterfront, create new recreational facilities, build new housing and commercial space, generate significant additional tax revenues, create employment opportunities, encourage the use of mass transit and ferry service and enhance the waterfront ecosystem and habitat."
Over the next year, negotiations between the Township and Cherokee regarding the terms of a final redevelopment agreement were ongoing. It was Fusco's understanding that prior to the execution of a final redevelopment agreement either party had "the right to walk away." On May 11, 2005, the Township adopted a resolution authorizing the execution of a final redevelopment agreement with Cherokee.
Members of the Township Committee who voted on Cherokee's designation testified that they were favorably impressed by Cherokee's financial capacity and its planned contribution towards the construction of a community center. They were also convinced that it would be beneficial to have a single entity in charge of the project because of the complexities of the "permitting process."
During the trial, plaintiff developed as an alternate argument to its unconstitutional taking claim that the Township's action in designating Cherokee was arbitrary, capricious and an abuse of discretion because it was motivated by improper political considerations. It presented this evidence of alleged political impropriety.
In February 2004, a Cherokee attorney, Eric Wisler, learned that the DEP had offered CITGO a "nature resource damage settlement" which required CITGO to pay for the "cleanup" and to donate Petty's Island to a land preserve trust for use as a State park. While Cherokee was not adverse to having CITGO pay for the cleanup, both Cherokee and the Township wanted Petty's Island to remain part of the redevelopment project. Cherokee's attorneys *866 wanted to reach an agreement with the DEP regarding redevelopment of Petty's Island before agreeing to undertake the project. To this end, Cherokee's attorneys arranged a meeting with then-Governor McGreevey. McGreevey allegedly assured Cherokee "that the island would not be turned into a state park and that he was in favor of the proposed development." McGreevey advised Cherokee's attorney to meet with the DEP Commissioner and to be "candid" regarding Cherokee's intentions.
Two days after meeting with the Governor, Cherokee was contacted by the Commissioner and a meeting was arranged. Following a meeting between the Commissioner and Cherokee, the Township and the DEP entered into negotiations regarding the potential redevelopment of Petty's Island. The DEP and Cherokee subsequently entered into an agreement providing, among other things, that Cherokee would give the DEP $10,000,000 to be placed in the DEP's natural resource damage account upon the Township's acquisition of Petty's Island, and the DEP would forego CITGO's offer to donate the property to the State. CITGO was not included in the Petty's Island negotiations until after Cherokee reached this agreement with the DEP.
In March 2004, Wisler sent an e-mail to Tom Darden, a principal of Cherokee, inquiring about the status of a contribution for Governor McGreevey. On April 23 and 24, 2004, Darden and another Cherokee principal made a combined $20,000 contribution to the Democratic State Committee. In addition, Luthman acknowledged that during this same time period, the Township had repeatedly tried to secure the Governor's presence for the public announcement of Cherokee's designation. In April 2004, the Township requested Cherokee's participation in a fundraising event for the performing arts. Cherokee agreed to be listed as an official sponsor of the event.

II
In his comprehensive post-trial decision, Judge Orlando described the issue to be decided as follows: "[T]his Court now must decide whether the naming of Cherokee as a master redeveloper, which will result in the acquisition of [plaintiff's] property by eminent domain, represents an unlawful taking of [plaintiff's] property." The judge noted that the parties agreed "that the naming of Cherokee as master redeveloper will result in the acquisition of [plaintiff's] property by eminent domain."
Judge Orlando concluded that the proposed condemnation of plaintiff's property comported with State and Federal constitutional requirements. In this regard, the judge noted that plaintiff had not challenged the redevelopment designation and, therefore, conceded that the planned redevelopment served a public purpose. Relying on a long line of United States Supreme Court cases culminating in Kelo v. City of New London, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), as well as the decision of the New Jersey Supreme Court in Levin v. Township Committee of Bridgewater, 57 N.J. 506, 543, 274 A.2d 1, appeal dismissed, 404 U.S. 803, 92 S.Ct. 58, 30 L.Ed.2d 35 (1971), the judge stated that "once it is established that the project in question constitutes a public purpose, it is for the legislative branch of government to determine the various parcels of land which need to be condemned to achieve the project's goal."
The judge rejected plaintiff's claim that the Township did not need to condemn plaintiff's property, but planned to do so only to benefit Cherokee in return for its political contributions. He found that the *867 Township's proposed acquisition of plaintiff's property was "primarily to bring the redevelopment plan for the decayed and contaminated waterfront to fruition."
Regarding plaintiff's challenge to "the process by which Cherokee was designated as master developer," the judge found no violation of New Jersey law. He noted the absence of statutory criteria governing the selection of a redeveloper, and found no impropriety in the fact that Cherokee's political connections helped it gain ready access to local officials in its bid to obtain the waterfront redevelopment contract. Although the judge did not doubt that Cherokee used its political connections to obtain a prompt meeting with the Township's key decision makers in December 2003, he was persuaded that "[o]nce at the table, it was Cherokee's demonstrated success in completing other similar projects, its willingness to undertake the development of Pennsauken's entire waterfront and its aggressive approach to beginning work on the project that captured the attention of Pennsauken officials." The judge observed that when Cherokee presented its plan in December 2003, plaintiff's "pace on its concept plan had slowed, and it was uncertain when or if [plaintiff] would move forward with the project." Furthermore, plaintiff had "no plans" for the redevelopment of various other properties within the redevelopment area, whereas "Cherokee offered the prospect of transforming the entire waterfront in a single cohesive project developed in accordance with the master plan. . . ."
Furthermore, Judge Orlando found that the Township had "legitimate and sound reasons" for selecting Cherokee as a master redeveloper, and that the Township's actions were not irrational. In particular, the judge found that Cherokee was selected "because of the perceived environmental, ecological, processing, scheduling, planning, and fiscal benefits, which [the Township] believes will result from having a single developer coordinating the entire project."
The judge found that these reasons were not pretextual. He noted that Robert Brown, the author of the Township's master plan, concurred "that superior results can be achieved by using a global or master redeveloper." Also, plaintiff failed to present evidence that Cherokee would not produce the anticipated results.
Accordingly, the judge concluded that the Township's decision to designate Cherokee as master redeveloper was entitled to deference.

III
We first address plaintiff's argument that the Township's designation of Cherokee as master redeveloper amounted to an illegal taking. Plaintiff asserts that as the owner of the property and a long-time taxpayer it had the right to redevelop its property consistent with the redevelopment plan. According to plaintiff, the Township had encouraged plaintiff to develop plans for its own parcel, as well as two other sites, and ultimately approved of plaintiff's plans. Then, for politically motivated reasons, the Township instead determined to condemn plaintiff's property in order to turn it over to Cherokee for redevelopment. In plaintiff's view, the Township's action amounted to "the sort of conferral of an impermissible private benefit which is unconstitutional under all of the relevant case law."
In addition, plaintiff claims that the trial court erred in dismissing its constitutional challenge without addressing the threshold issue of whether the selection of Cherokee and concomitant "threatened" taking of plaintiff's property was necessary to carry out the redevelopment plan. In plaintiff's *868 view, the Township was unable to establish such necessity because plaintiff was capable of redeveloping the property on its own.
We find these arguments unpersuasive. The premise of plaintiff's constitutional taking argument is unfounded because plaintiff does not have a constitutional right to redevelop its own property. Rather, plaintiff has a right to be fairly compensated for property if it is taken by condemnation for a public purpose such as redevelopment. Plaintiff has presented no evidence or arguments to dispute that its property is in need of redevelopment and therefore cannot dispute the existence of a public purpose.
Under both the United States and New Jersey Constitutions, private property may be taken for "public use." U.S. Const. amend. V; N.J. Const. art. I, § 20. However, the Takings Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, states that public property shall not "be taken for public use, without just compensation." Lingle v. Chevron USA, Inc., 544 U.S. 528, 536, 125 S.Ct. 2074, 2080, 161 L.Ed.2d 876, 886 (2005). The New Jersey Constitution contains a similar, parallel provision. N.J. Const. art. 1, ¶ 20. "As its text makes plain, the Takings Clause `does not prohibit the taking of private property, but instead places a condition on the exercise of that power.'" Lingle, supra, 544 U.S. at 536, 125 S.Ct. at 2080, 161 L.Ed.2d at 886 (quoting First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 314, 107 S.Ct. 2378, 2385, 96 L.Ed.2d 250, 263 (1987)).
In addition, the New Jersey Constitution specifically recognizes that "[t]he clearance, replanning, development or redevelopment of blighted areas shall be a public purpose and public use, for which private property may be taken or acquired." N.J. Const. art. VIII, § 3, ¶ 1 (emphasis added). Thus, a valid redevelopment determination satisfies the public purpose requirement.
The New Jersey Constitution also provides that "[m]unicipal, public or private corporations may be authorized by law to undertake such clearance, replanning, development or redevelopment. . . ." N.J. Const. art. VIII, § 3, ¶ 1. Accordingly, a municipality's delegation of redevelopment authority to a private corporation pursuant to statute does not negate the public purpose of such redevelopment. In keeping with these constitutional provisions, the LRHL sets forth the powers of a municipal entity to determine that an area is in need of redevelopment and to carry out a redevelopment plan.
Under the LRHL, in order to declare an area in need of redevelopment, there must be substantial evidence of the existence of at least one of seven specified conditions. N.J.S.A. 40A:12A-5. As we have stated, the Township found several to exist here. "A redevelopment area may include lands, buildings, or improvements which of themselves are not detrimental to the public health, safety or welfare, but the inclusion of which is found necessary . . . for the effective redevelopment of the area of which they are a part." N.J.S.A. 40A:12A-3. Accordingly, it is not necessary that every property within the area designated for redevelopment be substandard provided that the "area as a whole qualifies" for redevelopment. N.J.S.A. 40A:12A-3; Forbes v. Bd. of Trs. of S. Orange Vill., 312 N.J.Super. 519, 531-32, 712 A.2d 255 (App.Div.), certif. denied, 156 N.J. 411, 719 A.2d 642 (1998); see also Lyons v. City of Camden, 52 N.J. 89, 97, 243 A.2d 817 (1968).
We find unpersuasive plaintiff's argument that the sites comprising the redevelopment *869 area are not contiguous and could be redeveloped separately. The sites are in close proximity and relate to each other in material ways, involving the waterfront, wetlands, wildlife habitat, access, the need for remediation, the permit process, and the like. Further, plaintiff's property is contiguous to the Parisi property, is across the street from the Acme property, and is connected by a bridge to Petty's Island. The redevelopment area also relates in similar ways to and abuts the Cramer Hill redevelopment area in Camden. The issue before us is not whether piecemeal redevelopment is possible but whether the Township's choice of unitary redevelopment was reasonable.
The LRHL provides a mechanism for property owners to challenge a redevelopment determination and to obtain review in the Superior Court. N.J.S.A. 40A:12A-6b(4) to (7). Judicial review of a redevelopment determination is limited to whether the determination is supported by substantial credible evidence. Levin, supra, 57 N.J. at 540, 274 A.2d 1. If "supported by substantial evidence," a redevelopment determination "shall be binding and conclusive upon all persons affected by the determination." N.J.S.A. 40A:12A-6b(5). Once it is established that the redevelopment determination is binding, either because it was not challenged or was upheld following judicial review, the municipality must adopt a redevelopment plan before the redevelopment project can be undertaken. N.J.S.A. 40A:12A-7. Then the municipality is afforded broad statutory authority to "[d]o all things necessary or convenient to carry out its powers." N.J.S.A. 40A:12A-8n (emphasis added). This broad grant of authority includes the power to acquire, by condemnation, any property "necessary for the redevelopment project," N.J.S.A. 40A:12A-8c, and the right to contract with a private redeveloper if "necessary or convenient," N.J.S.A. 40A:12A-8f. The determination of necessity is a legislative, not judicial, decision, and, if reasonable, will not be judicially disturbed.
Plaintiff did not avail itself of the opportunity to challenge the redevelopment determination. Consequently, as correctly found by Judge Orlando, the public purpose of the Township's redevelopment determination was unassailable. Further, having adopted a redevelopment plan, the Township was entitled to exercise its broad statutory powers under the LRHL to designate a private developer and to condemn property in furtherance of its plan.
Nonetheless, plaintiff relies on the principle that the power of eminent domain must always be exercised in the public interest and "without favor to private interests." City of Atlantic City v. Cynwyd Invs., 148 N.J. 55, 73, 689 A.2d 712 (1997). Plaintiff argues that the Township's designation of Cherokee as master redeveloper was for the purpose of conferring a private benefit on a private party. Our Supreme Court has expressly rejected this argument, explaining:
Once a proper declaration of blight is made, there is no substance to the contention that the result of the governmental action in selecting a redeveloper is to take property from one individual and turn it over to another in violation of the due process requirements of the Federal Constitution. . . . [T]he private developer is really the instrumentality used to accomplish the public purpose.
[Levin, supra, 57 N.J. at 543, 274 A.2d 1.]
Stated otherwise, "the fact that a private party may benefit from the taking does not render the taking private and not for `public use.'" Twp. of W. Orange v. 769 *870 Assocs., 172 N.J. 564, 571, 573, 800 A.2d 86 (2002); accord Wilson v. Long Branch, 27 N.J. 360, 376, 142 A.2d 837, cert. denied, 358 U.S. 873, 79 S.Ct. 113, 3 L.Ed.2d 104 (1958).
Contrary to plaintiff's contentions, the view expressed by Levin is entirely consistent with the more recent Kelo holding. Plaintiff cites Kelo for the proposition that a municipality cannot "be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit." Kelo, supra, 545 U.S. at 478, 125 S.Ct. at 2661, 162 L.Ed.2d at 450. However, the Court held in Kelo that "[o]nce the question of public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch." Id. at 489, 125 S.Ct. at 2668, 162 L.Ed.2d at 457.
Consequently, there is no merit to plaintiff's taking argument because it was established that the planned redevelopment of the waterfront served a public purpose and Cherokee was merely the instrumentality used to accomplish the public purpose.
Nor are we persuaded that reversal is required because the trial court failed to determine the "necessity" of the threatened condemnation of plaintiff's property. The trial court found that the Township's anticipated condemnation of plaintiff's property was "primarily to bring the redevelopment plan for the decayed and contaminated waterfront to fruition" and not "primarily to benefit Cherokee." A finding of necessity was implicit in this language.
That plaintiff is capable of redeveloping its own property, and perhaps one other site, through private effort is irrelevant. Our Supreme Court rejected a similar claim in Levin where the owners of 20 acres, within a 120-acre redevelopment area dubbed the "Triangle," challenged a municipal blight determination on the basis that the Triangle could be developed privately. Levin, supra, 57 N.J. at 515-16; 530-31, 274 A.2d 1. The Levin plaintiffs planned to develop a twelve-acre shopping center on their property, and to acquire additional property to expand the center to about sixty acres over a three to five year period. Id. at 530-31, 274 A.2d 1. In rejecting the plaintiffs' challenge, the Supreme Court stated
We see no reasonable basis in this case for challenging the decision of the local bodies that the Triangle should be considered as a single area and developed in a homogenous fashion with a regional shopping center as the nucleus. That developmental goal seems common to all the interested parties in the case. Such unitary development represents the maximum potential usefulness within the aim of the Blighted Area Act. . . . The recent flurry of speculative activity and the attendant attempts to assemble lots in the area do not negate the land's long standing condition of stagnation and unproductiveness. Rather, it confirms the view that although fallow so long and thus blighted, because of the combination of conditions which brought that state about, it now has a high potential for fruitful utilization. The desire of plaintiffs to use their own tract for development as a shopping center or to have the opportunity to assemble all of the land in the Triangle over a period of years for complementary development should not militate against the blight declaration. So far as plaintiffs' tract is concerned it must be considered an essential part of any comprehensive redevelopment project, if optimum community benefit is to be realized.

*871 [Id. at 539-540, 274 A.2d 1 (emphasis added).]
We reject plaintiff's additional argument that the court was required to address the "necessity" of the designation of a master redeveloper. "Necessity" does not govern a municipality's selection of a redeveloper. There are no statutory or constitutional limitations on a municipality's selection of a private developer to carry out a redevelopment plan. The discretion to contract with a private redeveloper, pursuant to N.J.S.A. 40A:12A-8f, is part of the municipality's broad authority to "[d]o all things necessary or convenient to carry out its powers." N.J.S.A. 40A:12A-8n (emphasis added). Consequently, even if plaintiff established that it was capable of redeveloping its own property, the Township nonetheless had the authority to designate a master redeveloper to execute the redevelopment plan if it reasonably found it convenient to do so in carrying out its redevelopment plan for the waterfront area.
We are satisfied the trial court did not err in holding that the Township's decision to designate Cherokee as master redeveloper did not violate constitutional requirements.

IV
We next address plaintiff's argument that the designation of Cherokee as master redeveloper was arbitrary, capricious and in bad faith, given the Township's extensive prior dealings with plaintiff and the evidence of political favoritism towards Cherokee. Plaintiff argues that Cherokee's selection was the result of political favoritism, and that any other justification proffered by the Township was pretextual. Plaintiff further argues that reversal is required because the trial court largely ignored plaintiff's evidence of pretext and made findings of fact regarding the Township's justifications for designating Cherokee that were "totally unsupported" by the record. Under these circumstances, plaintiff argues that the Township's selection of Cherokee was not entitled to the deference normally afforded such municipal actions.
As the trial court correctly observed, the LRHL does not set forth any criteria governing the selection of a private redeveloper. See Bryant v. City of Atlantic City, 309 N.J.Super. 596, 624, 707 A.2d 1072 (App.Div.1998) (no requirement that a municipality issue a request for qualifications for potential redevelopers). It merely provides that once a redevelopment plan has been adopted, the municipality "may" contract with a redeveloper to undertake the redevelopment project, or any part thereof. N.J.S.A. 40A:12A-8f.
Given the absence of any legislated selection criteria, the designation of a redeveloper, like all municipal actions, is a discretionary act, vested with a presumption of validity, that will be upheld where any state of facts may reasonably be conceived to justify the action. Quick Chek Food Stores v. Twp. of Springfield, 83 N.J. 438, 447, 416 A.2d 840 (1980); see also Concerned Citizens of Princeton, Inc. v. Mayor and Council of Princeton, 370 N.J.Super. 429, 452-53, 851 A.2d 685 (App.Div.), certif. denied, 182 N.J. 139, 861 A.2d 844 (2004) ("Redevelopment designations, like all municipal actions, are vested with a presumption of validity."); Downtown Residents for Sane Dev. v. City of Hoboken, 242 N.J.Super. 329, 332, 576 A.2d 926 (App.Div.1990) (presumption of validity applied to the adoption of a redevelopment plan). Municipal bodies "are presumed to act on the basis of adequate factual support and, absent a sufficient showing to the contrary, it will be assumed that their enactments rest upon some rational basis within their knowledge *872 and experience." Hutton Park Gardens v. Town Council of W. Orange, 68 N.J. 543, 564-65, 350 A.2d 1 (1975); see also Gallenthin, supra, 191 N.J. at 373, 924 A.2d 447 (affirming that the standard of review of a municipal redevelopment designation is that it is supported by substantial evidence, and cautioning that a "bland recitation of applicable statutory criteria and a declaration that those criteria are met" is sufficient).
The challenger of municipal action bears the "heavy burden" of overcoming this presumption of validity by showing that it is arbitrary, capricious or unreasonable. Bryant, supra, 309 N.J.Super. at 610, 707 A.2d 1072. A challenger can overcome this presumption "`only by proofs that preclude the possibility that there could have been any set of facts known to the legislative body . . . [that] would rationally support a conclusion that the enactment is in the public interest.'" Ibid. (quoting Hutton Park Gardens, supra, 68 N.J. at 565, 350 A.2d 1).
Most of the allegedly erroneous fact-findings cited by plaintiff concerned the trial court's acceptance of the Township's reasons for designating Cherokee. However, the record amply supports the court's conclusion that the selection of Cherokee was primarily based on Cherokee's outstanding credentials and the many perceived benefits of having a single redeveloper coordinate the entire project in a cohesive manner.
For example, in its May 2004 resolution conditionally designating Cherokee as the redeveloper for the project, the Township recognized Cherokee's "unique qualifications" as a nationally recognized redeveloper of brownfields and other industrially contaminated sites. The Township's stated reasons for the selection of Cherokee included Cherokee's demonstrated ability to remediate the brownfields sites and other industrially contaminated sites within the waterfront redevelopment area. The resolution also referenced the Township's favorable impression of Cherokee's redevelopment proposal which would "provide public access to the waterfront, create new recreational facilities, build new housing and commercial space, generate significant additional tax revenues, create employment opportunities, encourage the use of mass transit and ferry service and enhance the waterfront ecosystem and habitat." Cherokee's proposal also contemplated execution of an escrow agreement with the Township, by which Cherokee would "provide all funds necessary for the preliminary acquisition of properties and other activities associated with the development of the waterfront." Based upon its consideration of the foregoing factors, the Township reasonably concluded that it was
in the best interest of the citizens of the Township of Pennsauken to engage in a partnership with a private developer with the experience and reputation of [Cherokee] to bring all the resources both private and public sectors to bear to achieve the best possible results as it relates to the precious resource of lands fronting on the Delaware River.
The Township's stated reasons for selecting Cherokee were borne out by the trial testimony. The Township's witnesses uniformly testified that the designation of Cherokee was premised upon Cherokee's willingness to execute the waterfront redevelopment plan as a single cohesive project, its experience and demonstrated ability, its financial capabilities, and the many benefits of having a single redeveloper. This contrasted with plaintiff's more limited experience in the field of industrial development and the emphasis plaintiff placed on the development of its own property on its own terms. Thus, the Township's reasons for selecting Cherokee were *873 valid given the abundant evidence attesting to the clear benefits of having the area redeveloped comprehensively and in one accord.
Plaintiff maintains that the Township's decision was in bad faith because Cherokee used its political connections to obtain the redevelopment contract. However, as recognized by the trial judge, the record shows that while Cherokee's political connections facilitated a prompt audience with Township officials, it was Cherokee's qualifications, proposal and financial strength, and not political considerations, that motivated the Township's selection of Cherokee as master redeveloper. Cherokee's proposal was superior to that of plaintiff because Cherokee had the demonstrated ability to undertake the expeditious redevelopment of the entire waterfront, whereas plaintiff primarily sought an opportunity to develop its own property.
The Levin Court rejected a similar complaint of bad faith made by property owners who claimed that the Township had adopted a redevelopment determination to prevent them from developing their property as "a Two Guys type" of shopping center. Levin, supra, 57 N.J. at 542, 274 A.2d 1. The Township allegedly wanted to bring a more high quality shopping center to the community, and planned to transfer the plaintiffs' property to another private corporation for development consistent with that vision. Id. at 542-43, 274 A.2d 1. In rejecting the plaintiffs' claim of bad faith, the Court cited the Township's "honest belief" that "the public good would be served by redevelopment of the area as a unit by a private developer, selected by the Township Committee, who would assemble and develop the land with its assistance and within such reasonable conditions with regard to the manner and course of development as it might impose." Ibid. The Court found no reason to doubt the Township's view "that the community interest will be best served by integrated and compatible development of the entire 120 acre Triangle." Id. at 538, 274 A.2d 1. "If it was properly declared a blighted area, the conclusion is inescapable that the Township Committee in good faith intends to achieve that kind of development." Ibid.
Thus, as a general proposition, it is hardly debatable that the public good may be served by the integrated redevelopment of various sites as a unit by a private developer. Here, the Township determined that the public good was clearly served by the selection of Cherokee over plaintiff. Like the trial court, we find nothing unreasonable in that determination. At no time prior to the Township's selection of Cherokee did plaintiff ever state an interest in undertaking the redevelopment of the entire waterfront area. At best, plaintiff proposed to redevelop its own property and perhaps one additional site. Cherokee, on the other hand, proposed to undertake the entire project and demonstrated its ability to do so. Under these circumstances, the Township cannot be said to have acted in bad faith in designating Cherokee, because redevelopment of the entire area as a unit served the public good.
Nor are we persuaded that the Township's real motivation for designating Cherokee was Cherokee's political activities. The Township and Cherokee were in negotiations when Cherokee learned of CITGO's negotiations with the DEP. Cherokee's political maneuverings with the DEP and Governor were limited to retaining the Petty's Island site as part of the redevelopment plan, which inured to the benefit of the Township. CITGO was a party to the final agreement regarding Petty's Island and apparently had no complaint with the manner in which this agreement was reached. It does not follow that *874 the Township gave Cherokee the redevelopment contract as a result of improper considerations.
Plaintiff also challenges the trial court's findings to the effect that plaintiff was not wholly committed to the project. Although this was a hotly disputed issue at trial, there was ample evidence to support the court's findings. Plaintiff did not promptly execute the draft redevelopment agreement and its president acknowledged that it was prepared to end negotiations with the Township if market conditions changed and made the project less advantageous. In any event, the strength of plaintiff's commitment to the project was not dispositive of the determination of whether the selection of Cherokee was reasonable.[4] Even if plaintiff were totally committed to acting as redeveloper of its own property, this would not outweigh the benefit to the Township of appointing a single developer committed to redeveloping the entire waterfront.
The judicial prerogative does not allow for second guessing the decisions of legislative bodies. So long as those decisions are in accordance with law, factually supported, and not arbitrary, capricious or in bad faith, they are entitled to judicial deference. Plaintiff failed to demonstrate that the Township's decision to designate Cherokee as master redeveloper was contrary to law, was not justified by any reasonable facts, or was the result of arbitrary or capricious conduct or bad faith. Therefore, we have no occasion to disturb it.
Affirmed.
HOLSTON, J.A.D., dissenting.
The issue to be decided, in my view, is not whether Pennsauken's choice of unitary redevelopment was reasonable, but whether a municipality can use eminent domain to transfer property from the private owner of a property to a private redeveloper when the public purpose to be served by the use of eminent domain will be accomplished by the private owner without the use of eminent domain. The answer is found in the Legislature's statutory limitation of "Article VIII, Section 3, Paragraph 1, of the New Jersey Constitution, which authorizes the taking of `blighted areas' for redevelopment[,]" Gallenthin Realty Dev., Inc. v. Borough of Paulsboro, 191 N.J. 344, 355, 924 A.2d 447 (2007), by its adoption of N.J.S.A. 40A:12A-8(c). In my view, the "necessary" clause contained in that statute prevents such a use of the eminent domain power of local government.
I agree with the majority that Vineland Construction Company's (VCC) property is necessary for Pennsauken's redevelopment project. However, I disagree with the majority's conclusion that the acquiring of VCC's property by eminent domain by a master redeveloper is necessary for the successful completion of the redevelopment project.
I note that in Kelo v. City of New London, 545 U.S. 469, 489, 125 S.Ct. 2655, 2668, 162 L.Ed.2d 439, 458 (2005) the Supreme Court made clear that nothing in its decision precluded "any State from placing further restrictions on its exercise of the takings power." N.J.S.A. 40A:12A-8(c) clearly establishes a statutory limitation on the right of eminent domain in New Jersey, by requiring that before land can be acquired by condemnation that the condemning authority demonstrate that it is necessary to acquire the property in *875 order to fulfill the goals of the redevelopment project.
N.J.S.A. 40A:12A-8(c), titled "Effectuation of redevelopment plan," states in applicable part:
Upon the adoption of a redevelopment plan . . . the municipality or redevelopment entity designated by the governing body may proceed with the clearance, replanning, development and redevelopment of the area designated in that plan. In order to carry out and effectuate the purposes of this act and the terms of the redevelopment plan, the municipality or designated redevelopment entity may:
. . . .
c. Acquire, by condemnation, any land or building which is necessary for the redevelopment project, pursuant to the provisions of the "Eminent Domain Act of 1971[.]"
[(emphasis added.)]
The word necessary when involving the right of eminent domain does not mean "`absolutely necessary' or `indispensable' but [] it is sufficient if the right proposed to be acquired is reasonably necessary to secure the end in view." Lidgerwood Estates, Inc. v. Pub. Serv. Elec. and Gas Co., 113 N.J.Eq. 403, 407, 167 A. 197 (Ch.1933) (quoting Sayre v. City of Orange, 67 A. 933 (Sup.Ct.1907)). "The addition of the adverb 'reasonably' . . . does little but emphasize that absoluteness or indispensability is not to be required. It is reasonable necessity . . . in the light of all the facts and circumstances and balancing all interests." In re Application of Hackensack Water Co., 41 N.J.Super. 408, 426, 125 A.2d 281 (App.Div.1956).
As testified during the trial, VCC is ready, willing, and able to adequately fund and abide by the design of the redevelopment plan. John Krauser, president and chief operating officer of VCC testified:
The fact of the matter is that we feel that we're qualified to take our site and take it through the diverse requirements of the remediation process. We don't need Cherokee to do that for us. We've demonstrated our ability to do it. We do it all the time with our other projects. It seemed to us to be inappropriate for them to say to us as a landowner who has invested in the property, held it for development, and kept it for 30 years ready for redevelopment, and  to redevelop pursuant to redevelopment plan and to work with whomever they should choose to appoint to oversee that redevelopment, to turn around and say, "But by the way, we're taking your property and yes, there's a possibility you can buy it back in the future."
Krauser added:
We've made a commitment to this project with our dollars and our time. We wouldn't have gone this far unless we were serious about it. The fact that we own the land keeps us committed to this project in a way that somebody else who has no ties monetarily to the piece doesn't have that. We're committed to this project.
. . . .
All those things that our plan contains were things that they agreed to and said were desirable. So the fact is we got to the door with them. We did everything that they asked us to do. And then without any public setting, without any plan put forward by Cherokee, by any kind of undertaking, vision, concept, plan, agreement with Cherokee whatsoever, simply said that's it. We're going with Cherokee.
Now we've done redevelopment in other areas. . . . We did nothing that would indicate that we were not capable of developing. . . .

*876 The fact of the matter is that we demonstrated to them not just through our interaction with them, but with our interaction with every agency that they knew would have an impact on this plan, that we had a tangible, viable, feasible plan. And if their worry is that well you didn't have any economic modeling, that was our risk. That was our dollars at risk. We were the ones that were saying we're willing to put our dollars up for this plan. It didn't matter to me whether or not Cherokee thought our plan was feasible in terms of economics or whether . . . somebody else does. We believed it was economically feasible and we were prepared to roll forward with it because that's how we got as big as we did.
On June 27, 2001, Pennsauken adopted an ordinance adopting a redevelopment plan prepared by its planning consultant, Marc R. Shuster. The objectives of the redevelopment plan included the "environmental rehabilitation of existing compromised sites" and the development of "a unique mix of land uses designed for the particular characteristics of the area." The potential uses contemplated by the plan included "marine oriented uses, general athletic field, lodging, institutional/governmental uses, retail, educational facilities, dining, and active and passive recreational uses." However, the land for which the redevelopment was planned consisted principally of four non-contiguous lots, one of which is owned by VCC.[5] On May 11, 2005, Pennsauken adopted a resolution authorizing the execution of a final redevelopment agreement with Cherokee, designating Cherokee the general redeveloper for the project, including the parcel owned by VCC.
I am of the view, therefore, that Pennsauken has not shown that it is necessary, under N.J.S.A. 40A:12A-8(c), for Cherokee to acquire the property through the power of eminent domain, pursuant to the Eminent Domain Act, N.J.S.A. 20:3-1 to -50, to complete the redevelopment project.
The majority relies on Levin v. Township Committee of Bridgewater, 57 N.J. 506, 274 A.2d 1, appeal dismissed, 404 U.S. 803, 92 S.Ct. 58, 30 L.Ed.2d 35 (1971), in their conclusions that reversal is not required because 1) the trial court implicitly found that VCC's property was necessary for the redevelopment plan and 2) VCC's capability of redeveloping its own site through private effort is irrelevant. In my judgment, Levin, supra, does not have any bearing on this case. The issue in Levin was whether the 120 acre land area in question was properly the subject of a declaration of blight under N.J.S.A. 40:55-21.1(e). Id. at 515, 538, 274 A.2d 1. The Court concluded that it was. That is not the challenge here.
The total redevelopment area proposed by Pennsauken in its redevelopment plan, unlike the triangular shaped contiguous area in issue in Levin, is not contiguous. The plaintiffs were not prepared to develop their portion of the parcels in accordance with the redevelopment plan proposed by Bridgewater Township but rather sought to develop their twenty acres of assembled parcels in accordance with their own visualized plan. Id. at 532-33, 542, 274 A.2d 1. Additionally, unlike VCC's parcel here, because of the contiguous nature of the parcels within the triangle, to have carved out the plaintiffs' lands from the rest of the triangle would have hindered creation of an integrated *877 and comprehensive plan, interfered with the establishment of an internal road system and created traffic access problems. Id. at 536, 274 A.2d 1.
The Court in Levin stated that once a declaration of blight is made there is no constitutional due process violation, when as a result of governmental action a redeveloper is chosen to undertake the redevelopment project according to a comprehensive plan created by the governing body. Id. at 543, 274 A.2d 1. However, Levin does not speak to the situation here, where the private owner, VCC, is able and willing to develop its separate and discrete noncontiguous parcel in accordance with Pennsauken's redevelopment plan, thereby making its acquisition by condemnation unnecessary for the completion of the redevelopment project. N.J.S.A. 40A:12-8(c).
Permitting VCC to complete redevelopment on its parcel will fulfill the municipality's redevelopment plan and its objectives for that parcel. Accordingly, VCC, through the use of private capital, is able to satisfy the redevelopment plan for that portion of the redevelopment project. Indeed, Cherokee will not itself perform any of the redevelopment services, but instead will subcontract them out to others. Additionally, there has been no showing that redevelopment cannot be performed on the other non-contiguous lots in the redevelopment area without condemning VCC's parcel. Nor is there any evidence that Cherokee is unwilling to conduct redevelopment on the other parcels without VCC's property being included.
Municipal action will be overturned "if it is arbitrary, capricious or unreasonable." Bryant v. City of Atlantic City, 309 N.J.Super. 596, 610, 707 A.2d 1072 (App. Div.1998). A determination predicated on unsupported findings is the essence of arbitrary and capricious action. Ibid. It is my view that granting to Cherokee the redevelopment rights over VCC's property, knowing full well that VCC was fully capable of developing its parcel in accordance with the redevelopment plan, where as here, plaintiffs' parcel is separate and apart from the other parcels for which a master developer is arguably necessary, constitutes arbitrary and unreasonable action.
Pennsauken's decision to permit Cherokee as general redeveloper to acquire VCC's property by condemnation constitutes, in my view, a manifest abuse of the redevelopment statute and the powers attendant thereto. The record demonstrates that the announced public purpose for the redevelopment project could be achieved without the exercise of eminent domain over the VCC property. Therefore, the taking is unnecessary and will not further a "public" purpose because the public purpose can be fully realized with the private capital and voluntary actions of the current property owner. Where, as here, the future use of the property as intended by the current property owner is identical to the future use intended by the municipality, the taking is not necessary and cannot be justified.
As stated by the Supreme Court in Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 103, 99 L.Ed. 27, 38 (1954), the "power of eminent domain is merely the means to the end." Thus, that power cannot be exercised when the end will be achieved without its invocation in the first place.
In my view Pennsauken cannot justify its conduct here by claiming that it needed to adopt an "integrated" approach to the waterfront redevelopment under a single redeveloper. Even under the present Cherokee plan, the VCC site would be developed separately and discreetly from the other parcels in the waterfront redevelopment area. Whether Cherokee *878 remediates VCC's property and sells it to someone else or back to VCC for redevelopment (at a profit to Cherokee), or whether VCC remediates it and redevelops it, the end result of the redevelopment will be the same. The crucial difference is in the identity of the party to carry out the project: the actual property owner and long-time taxpayer, or Cherokee, a private redeveloper, which was, in my view, conferred by its designation an unnecessary private benefit. See Kelo, supra, 545 U.S. at 477, 125 S.Ct. at 2661, 162 L.Ed.2d at 450 ("it has long been accepted that the sovereign may not take the property of A for the sole purpose of transferring it to another private party B, even though A is paid just compensation"); see also Kelo, supra, 545 U.S. at 493, 125 S.Ct. at 2670, 162 L.Ed.2d at 460 (Kennedy, J., concurring) ("[t]here may be private transfers in which the risk of undetected impermissible favoritism of private parties is so acute that a presumption (rebuttable or otherwise) of invalidity is warranted under the Public Use Clause.").
As a result, I respectfully dissent from the majority's opinion. I would reverse so much of the trial court's orders that validate Pennsauken's grant to Cherokee by resolution the power to acquire by eminent domain the portion of the redevelopment project owned by VCC and to redevelop VCC's property.
NOTES
[1] Because the in need of redevelopment determination is uncontested, this appeal is unaffected by the Supreme Court's recent decision in Gallenthin Realty Development, Inc. v. Borough of Paulsboro, 191 N.J. 344, 924 A.2d 447 (2007).
[2] Although no condemnation action was filed, the parties litigated to a conclusion the right to condemn issue in the trial court in anticipation of such an action. At oral argument before us all parties agreed that ripeness is not an issue and, if the right to condemn is upheld, the only remaining issue in the condemnation action, when it is filed, will be valuation.
[3] In addition to its unconstitutional taking count, plaintiff also filed counts for breach of contract and equitable estoppel. The breach of contract count was dismissed on summary judgment and the equitable estoppel count was dismissed at the end of plaintiff's case at trial. Although plaintiff's notice of appeal encompasses those dismissals, plaintiff makes no arguments pertaining to them and has thus abandoned its appeal as to those issues. See Zavodnick v. Leven, 340 N.J.Super. 94, 103, 773 A.2d 1170 (App.Div.2001).
[4] Contrary to our dissenting colleague's contention that plaintiff was ready, willing and able to perform in accordance with the Township's requirements, that fact was not established.
[5] Only one small parcel, the Parisi property, is contiguous to VCC's site. The other parcels are not contiguous to VCC's property.